HINSON v. STATE.

Opinion delivered July 22, 1905.

1. WITNESS—IMPEACHMENT AS TO IMMATERIAL MATTER.—Where a witness in a trial for assault with intent to kill was asked if he did not state to a certain person a day or two after the difficulty that he knew there was going to be a difficulty between one of the defendants and the party assaulted, and that witness went down there to see it well done, it was error to admit evidence to contradict the witness by proving that he had made such a statement. (Page 369.)

2. TRIAL—IMPROPER ARGUMENT.—Where a witness was improperly impeached by contradicting him as to an immaterial point, it was error to permit the prosecuting attorney to argue that the witness had been contradicted on a material point, and was therefore unworthy of belief. (Page 370.)

3. ASSAULT TO KILL—REDUCTION OF DEGREE.—A conviction of assault with intent to kill, with the consent of the Attorney General, will be reduced to a lower degree of the offense if such reduction will cure the only errors of which complaint is made. (Page 370.)

Appeal from St. Francis Circuit Court.

HANCE N. HUTTON, Judge.

Hinson and Scott were convicted of an assault with intent to kill, and have appealed.

Judgment modified.

### STATEMENT BY THE COURT.

R. H. Hinson and E. S. Scott were in March of this year engaged in logging, and lived with their wives in tents on the bank of the St. Francis river northeast of Forrest City. Not far away lived one Al. Smith, upon whom, on the 14th day of March, they committed an assault. Smith was struck on the head with a stick, and severely hurt, and the grand jury of St. Francis County indicted the defendant for an assault with intent to kill. On the trial the evidence showed the following facts: On the night of the 13th of March Smith indulged to some extent in intoxicating liquors, and while under the influence thereof he went to the tent where Hinson lived, and inquired if he was there. On being told that he was not at home, he made use of insulting language about him in the presence of Hinson's wife and child. Scott and his wife came from their tent to Hinson's tent, and after some persuasion induced Smith to return to his home. The witnesses say that after Smith returned home he came out of his house with a shotgun and pistol, and fired into the tent. One of the bullets of the pistol, so the witness testified, passed through the tent not far from where Mrs. Hinson was seated in the tent with her child. Witnesses also testified that Smith while at the tent made threats against Hinson. The next day, while Smith was near the place where logs were being placed in the river, Scott accosted him, and requested him to pay the money that Smith owed him. Smith told him that he would do so, but said that he might have to go to his house to get the money. Scott then said that when they arranged their business matters he wanted Smith to settle for his conduct of the previous night. To quote the language of one

of the witnesses for the State, "Smith then asked, 'What have I done?' Mr. Scott said, 'You cursed me, and abused me; you called me a son-of-bitch, and threatened to kill me.' Mr. Smith said, 'I did not do it; if I did, I apologize to you for it.' And about that time Mr. Scott struck him on the side of the head with a stick, staggering him, and knocked him partially down, and I think he struck him again. About the same time the defendant Hinson, who was standing near, ran up and struck Mr. Smith with a stick, and knocked him down. I think he struck him two or three times; once on the back, and once or twice on the head. When Mr. Hinson took part in the fight, Mr. Scott quit, and Scott and I caught hold of Hinson, and tried to pull him off of Mr. Smith. Hinson had dropped his stick, and had Smith by the throat with one hand, and was hitting him with the other. While Scott and I were trying to separate Hinson and Smith, they became engaged in a scuffle for a pistol in Smith's right hip pocket, and one Mr. J. S. Turner ran up and took the pistol from both of them, and carried it, and gave it to Mr. Bailey, who was sitting near in a wagon. When we succeeded in separating Hinson and Smith, Smith started off towards his house. When he had gone but a short distance, Hinson broke loose from us, and followed Smith, overtook him, and I think he struck him two or three times. Mr. Garrett went up, and caught hold of Hinson, and Smith got up, and started towards his home, and Hinson threw his stick after him." The sticks with which the assault was made were introduced in evidence, and a witness testified that a man could be killed with them. Other witnesses testified that, after Hinson commenced his assault upon Smith, Scott made no further effort to injure Smith, but on the contrary endeavored to prevent Hinson from striking him.

There was some testimony on the part of the defendant that Smith attempted to draw a pistol during the assault, and Hinson testified that he struck Smith because he thought he was about to draw his pistol in the effort to carry out the previous threats against himself and Scott. The jury returned a verdict of guilty against both defendants for the crime of assault with the intent to kill, and assessed the punishment of each of them at one year in the penitentiary, and judgment was rendered against them accordingly, and they appealed.

*R. J. Williams,* for appellants.

*Robert L. Rogers, Attorney. General,* for appellant.

There was no incompetent evidence admitted.  1 Greenl. Ev. 542, 546.

RIDDICK, J., (after stating the facts.)  This is an appeal from a judgment convicting the defendant of an assault with in-- tent to kill one Al. Smith.  While the evidence does not fully satisfy us that either of the defendants intended to kill Smith, the assault made by Hinson was very persistent, and, had no one interfered, might have resulted in the death of Smith.  As to Hinson, therefore, we think the evidence is sufficient to sustain the judgment.  The evidence against Scott, while it shows an assault, does not to our minds show an intent· to kill.  Before noticing that point further, we call attention to the argu- ment· of the appellants that improper evidence was admitted against them.  One Garrett, who testified for the defendants, and whose daughter was the wife of Scott, was asked on his cross-examination by the attorney for the State "if he did not state to one Duke a day or two after the difficulty, while he (Garrett) was on his way to Round Pond, that he (Garrett) knew that there was going to be a difficulty between Scott and Smith when they met, and that he went down there where they were to see it well done."  The defendants objected to the ask- ing of this question, but the court overruled the objection, and the witness responded that he had made no such statement to Duke or to any one else.  Afterwards the attorney for the State was, over the objections of the defendants, permitted to ask Duke whether Garrett had made such statement to him.  The answer of the witness was, "Yes, sir; he told me that he knew there was going to be a row next morning, and that he went down there to see it out." Now, the witness Garrett was not asked whether or not the defendants, or either of them, had told him that they intended to have a difficulty with Smith or make him settle for his conduct of the previous night.  He was not asked to state whether he knew there was going to be a difficulty between the defendants and Smith before it happened, or if he had any reason to believe that there would be trouble between them previous to the diffi- culty.  If these questions had been asked, and had been answered in the negative, then, to refresh his memory, or to impeach him,

the witness might have been asked if he had not made contrary statements to Duke. But, without having asked the witness anything of his own previous knowledge of the difficulty, the attorney for the State propounded to the witness the question as to whether he had not previously stated to Duke after the fight that "he knew there was going to be a row next morning, and went down there to see it out." As the witness answered this question in the negative, no prejudice would have resulted, had not the court permitted the State by its attorney to prove by Duke that the witness had stated to him after the difficulty that he knew it was going to take place, and went down to see it out. Now, as Garrett was not asked, and did not testify, whether he knew, previous to the difficulty, that the assault was going to be made, it was entirely immaterial what he said to Duke on the subject, for the answer did not tend either to corroborate or contradict his previous testimony, for the reason that he had not testified on that point. This testimony of the witness Duke contradicted Garrett about an immaterial matter, and should not have been permitted.

That the admission of this improper testimony was probably prejudicial is shown by the argument of the prosecuting attorney, for he contended in his argument before the jury that this testimony of Duke contradicted Garrett on a material point, and showed that he was unworthy of belief. It may have also aroused in the minds of the jury a suspicion that the assault upon Smith was premeditated, and caused them to find the defendants guilty of a higher grade of crime than they would otherwise have done. Proper exceptions were saved both to the admission of this evidence and to the argument of prosecuting attorney based upon it. We are of the opinion that the evidence was incompetent, and that for that reason the argument also was improper and prejudicial.

In conclusion, we will say that, though there may be evidence sufficient to support the judgment of an assault with intent to kill against the defendants, we feel very doubtful on that point, especially as to the defendant Scott. But, while we have doubt as to whether the defendants intended to kill Smith or not, we think it is clear that they were not justified in making the assault upon him. The evidence makes it very clear that

both of these defendants were guilty of an aggravated assault, and one of them may have been guilty of a higher crime. On the whole case, we are of the opinion that the judgment must be reversed and a new trial ordered unless the Attorney General should prefer to have the judgment sustained against them for one of the lower grades of crime included in the indictment. Unless he files a motion to that effect within one week, the judgment will be reversed, and a new trial ordered.