THOMPSON *v.* SOUTHERN LUMBER COMPANY.

Opinion delivered May 20, 1912.

1.  APPEAL AND ERROR—INSTRUCTION—GENERAL OBJECTION.—An instruction, in an action against a master for the negligent killing of a servant, to the effect that the jury were to indulge the presumption that the defendant was not guilty of negligence, and that the burden was on the

plaintiff to overcome such presumption, was not open to a general objection. (Page 204.)

2. SAME—INSTRUCTION—GENERAL OBJECTION.—Where an instruction contained incorrect language, but was not misleading when considered with other instructions given, the objection could not be raised by a general objection. (Page 204.)

3. INSTRUCTION—DUTY TO GIVE SPECIFIC INSTRUCTIONS.—It is not error for the court to give specific instructions in a hypothetical form covering the various phases of the evidence adduced. (Page 205.)

4. WITNESS—IMPEACHMENT.—A witness can not be impeached upon matters collateral to the issue. (Page 206.)

Appeal from Bradley Circuit Court; *Henry W. Wells,* Judge; affirmed.

### STATEMENT BY THE COURT.

This suit was instituted by Mattie Thompson in her own right as widow and as next friend of Pebble, Vertie and Tom Thompson, children and only heirs at law of Tom Thompson, deceased, against the Southern Lumber Company, to recover damages for the death of Thompson, alleged to have resulted by reason of the negligence of the appellee company. The complaint alleged, in substance, that Tom Thompson was an employee of the defendant, assisting in the operation of its mill; that one of his duties was to attend a piece of machinery commonly known as a conveyor, to which was attached a revolving shaft, with pulley, driving belt, cogs and chains. The use of the conveyor was to carry away the refuse or small bits of timber incident to the sawing of logs and the manufacture of lumber; that defendant negligently permitted the conveyor to become clogged or overloaded, thereby causing a greater strain on the belt attached to the pulley than it could bear or resist, and for the same reason produced a greater strain upon the cogs and conveyor chains than was proper; that defendant was also negligent in permitting the belt used under such conditions, when the same or a large portion thereof was defective and insufficient by reason of being too old and too worn to withstand the strain and tension to which it was subjected; that by reason of this negligence the belt attached to the pulley broke and recoiled upon the said Thompson with such force as to entangle his body and throw it upon a rapidly revolving shaft to which the pulley was attached, causing the

body to be so rapidly revolved around the shaft and to be so violently hurled therefrom as to tear and wrench the right leg from the body at the hip; that as a result of such injuries Thompson died; that plaintiffs had suffered pecuniary damage by reason of his death in the sum of $20,000, for which judgment was asked.

The defendant answered, admitting that Thompson was employed in the capacity alleged, but denied all the allegations as to negligence, and set up in defense contributory negligence and assumption of risk.

The testimony adduced by the appellants tended to establish the allegations of their complaint.

A witness, who was the foreman of the appellee, testified substantially as follows: Thompson had been in the employ of the appellee in different capacities about the mill for four or five years. At the time he was killed he was millwright. His duties were to keep the mill in general repair and the machinery in proper condition for working. A millwright is considered a superior employee for the reason that he possesses enough ability to understand machinery and repair and put in operation things that are necessary to be put in operation. He keeps in repair everything. It was his duty, among other things, to see that all belts are in proper repair. Thompson had been working seven days as millwright when he was killed. He was killed between 8 and 9 o'clock in the morning. The mill had been in operation since 7 o'clock.

The witness describes the machinery where Thompson was killed and the manner in which he was killed as follows: "He was near the line shaft which had a pulley that run the driving pulley that drove the gear and the main conveyor from the sawmill. The principal line shaft where Thompson was killed is the shaft by which all other machinery is driven. The power of the engine is applied directly to this shaft, and there is a counter shaft which is operated by a belt from the main shaft. The pulley on the main shaft is fourteen feet from the center of the pulley on the counter shaft, one being sixteen inches in diameter and the other sixty inches respectively. Mr. Thompson was engaged, at the time he met his death, in assisting me in putting the belt on these pulleys. He was holding the end of the belt on the revolving pulley, and was

about thirteen feet from me, and was on the side of the line of main shaft next to me, standing on the opposite side of the belt. He was on one side at one end, and I on the other side at the other end, the belt being between us. One of the conveyor chains had broken, and had wound itself around the sprocket that pulls these chains. I gave instructions to the men above to catch the refuse and slabs and hold them up on the platform of the conveyor and not throw them any faster than was necessary. I went back with Mr. Thompon to assist in this work, and we took the chain out. We unwound the chain from the sprocket and put it back in position. We unfastened the teeth of the small pinion that drives the power gear, and then went to work and took off the pinion and put on another and went up and fastened the chain. We always fasten the broken chain to the sound chain by its side. In order to fasten it, we belted the pulleys and started the mill up. We pulled it (the broken chain) twenty or thirty feet, and the fastening came loose; then it became necessary to throw the belt, and we did so. Mr. Thompson, Quimby and myself went upstairs again to fasten the chain. We fastened the broken chain with a chain, then we went back down to the lower part of the mill hurriedly. Mr. Thompson proceeded in the discharge of his duties in adjusting the pulleys. We picked up the belt and placed it on the pulley. He was holding the belt up there on the pulley, and I picked up my end of the belt and placed it on the wheel and got myself in a position to belt it. The wheel was about five inches in diameter. The first time I made the effort, it failed to belt the pulley. It ran off and got on the shaft, and Mr. Thompson picked it up and laid it on the pulley. I stood there and waited until he got everything prepared. When he got ready for me to belt the pulley, I picked up the belt off the counter shaft. It is an endless belt. When we failed to belt the pulley, it went over again. When we made the second effort to belt it, I brought the belt nearly to the center of the pulley, and it had not got around on the pulley. I reached over with one hand to catch it, and in that instant the belt was jerked out of my hand and went around the main line shaft. The shaft revolves 280 revolutions a minute. The belt was in operation, slipping around the pulley. It did not wind up. I saw Mr. Thompson

there, and the belt was coming over at this time. I thought the belt was jerking Mr. Thompson to the main shaft. He had been raised three times off the floor by the belt. He just stopped there in an instant. He went across the line shaft, and was carried over the pulley and thrown loose in going over the pulley.

"Mr. Thompson was standing six inches from the shaft which revolved the pulley. There was no danger particularly connected with these pulleys. It required two men to belt the two pulleys. They always stand in a position to keep themselves out of danger. To do this one would have to stand at arm's length and hold the belt out. We regarded it as dangerous to get right up against the pulley. When the belt was jerked out of my hand, it was jerked off on the opposite side of the pulley, which I was trying to belt. The reason it jerked out of my hand, it got wound up on the line shaft where Mr. Thompson was, and had wound up and caught him. The belt was not broken when it was jerked out of my hand. It broke afterwards when it was wound up on the line shaft. The belt was in good condition when I tried to put it on the pulley. It was a two-ply five-inch belt. It possessed all the strength of any belt with the exception of a slight wear on it. It was comparatively new. It had been used for some time; was a comparatively new belt when it was put on. We never operated the pulleys with any other kind of belt. The belt was of sufficient strength to perform the services it did three times. It took two or three horse power to operate the gear, and the belt was twelve-horse power. Mr. Thompson got caught, and the belt began to wind. It had to wind at least three or four revolutions before it would get tight enough to break that belt, and Mr. Thompson was caught in there about the first or second revolution of the pulley. I could not say whether his sleeve caught him, and that caused the belt to break, but the belt began to wind just a little bit before Mr. Thompson caught in it."

Witness then describes how Thompson appeared as he was caught on the line shaft; says he was thrown up and thrown loose, and thrown on the opposite side of the line shaft from witness, and his leg was torn loose from his body, and thrown next to witness. All the belt was wound up on the line shaft

except four or five feet. In unwounding the belt they found Thompson's shirt in there. They found his shirt sleeve in about the second round as it was unwound from the shaft.

Another witness testified that he had been in the sawmill business for sixteen years, and that it had been the general custom in belting a six-inch pulley to belt it with a belt one inch narrower. A five-inch belt would pull twice the load.

And still another witness, who had had ten years' experience in the sawmill business, testified that the belt in use at the time Thompson was killed was amply sufficient.

During cross examination, witness Ketchans, for the appellee, stated that he saw Thompson's wife on the day Thompson was killed, and had a few words conversation with her. The witness was asked if he stated to her at that time that "he warned everybody of the danger of that place except Thompson," and answered that he did not. The appellants offered to contradict this statement by showing by Mrs. Thompson and other witnesses that witness Ketchans had a conversation with her on the morning that her husband was killed, and in that conversation stated that "he knew the place where her husband was working was a dangerous place, and that he had warned all others except her husband." The court excluded the testimony to which appellants excepted.

The court granted the prayers of the appellants for instructions, submitting for the determination of the jury the questions of the negligence of the appellee, and contributory negligence and assumed risk on the part of Thompson.

And the court granted the following prayers of appellee for instructions:

"1. You are instructed that the burden of proof in this case rests upon the plaintiffs to establish their right to a recovery of damages by a preponderance of all the testimony. You are to indulge the presumption that the defendant lumber company was not guilty of any negligent or careless act in reference to the cause of the death of the said Tom Thompson, and the burden is upon the plaintiff to overcome this presumption by testimony, and if, after a consideration of all the evidence in the case, you find that the plaintiffs have failed to establish their right to damages by a preponderance of the evidence, then your verdict will be for the defendant."

"3. The court instructs the jury that when one enters the employ of another he assumes and is presumed to have contracted with reference to all of the ordinary risks, hazards and dangers of his employment. If in this case you believe from the evidence that the said Tom Thompson, while in the employ of the defendant lumber company on the day alleged in plaintiff's complaint, received injuries which resulted in his death, and if you further believe that the said injuries were received in consequence of the ordinary dangers incident to the scope of his employment, then your verdict should be for the defendant."

"4. You are instructed that the plaintiff's right or grounds to a recovery in this action is no greater than that of said Tom Thompson, had he lived. In this case you are instructed that what is known in law as contributory negligence on the part of the said Tom Thompson when the injury was sustained is a bar to this action if he was guilty of contributory negligence. The court tells you that contributory negligence is such negligence on the part of the injured person, whether it be acts of omission or commission as alleged, to produce the injury complained of. If you find from a preponderance of all the evidence that the said Tom Thompson was guilty of any negligence as defined in this instruction that helped to bring about or produce the injury which resulted in his death, then your verdict should be for the defendant."

"5. The court instructs the jury that, to entitle the plaintiffs to a recovery in this action, the jury must find from a preponderance of the evidence that the injury complained of was caused by the negligence or by lack of ordinary care by the defendant or its servants and employees, and that the said Tom Thompson did not directly contribute to the said accident or injuries which resulted in his death by any negligence or by want of prudence, or by his failure to exercise ordinary care for his own personal safety when the injury was sustained. If you find from the evidence in the case that the said Tom Thompson failed to exercise ordinary care for his safety in attempting to put the belt on the pulley at the time and in the manner in which he did, and but for this concurring and co-operating negligent act on his part, if you find such act was negligent, and without such negligent act his injury would

not have been sustained, then your verdict should be for the defendant, and this should be your verdict, notwithstanding you may also believe that the defendant lumber company was guilty of the negligence complained of as set out in plaintiff's complaint."

"7. You are instructed that if you find from the evidence in this case that at the time the deceased, Tom Thompson, was attempting to put the belt on the driving pulley his shirt sleeve became entangled in the belt of the shaft of the driving pulley on account of the negligence or inattention upon the part of the deceased, Tom Thompson, and further find that said negligence, if any there were, was the proximate cause of his death, then your verdict should be for the defendant."

The appellant duly saved exceptions to the rulings of the court. The verdict and judgment were in favor of the appellee, and appellants prosecute this appeal.

*John E. Bradley,* for appellants.

1. While negligence is generally not presumed from the happening of the accident, yet the circumstances under which the injury occurred may be sufficient to create the presumption. 92 Ark. 350; 91 Ark. 343; 2 Thompson on Neg. 1227-1235; Cooley on Torts, 796 *et seq.;* Sherman & Redfield on Neg. § 59; Wharton on Neg. §§ 421-422; Bigelow on Torts, 596; 67 Wis. 24; 81 Mo. 325; 21 Am. & Eng. R. Cases 466; 62 Tex. 323; 54 Ark. 212.

2. There is no evidence whatever to sustain the defense of contributory negligence; and, as to the plea of assumed risk, the servant can only be held to have assumed those risks which are ordinarily incident to the employment and of which he has knowledge; but he can never be held to have assumed the risks resulting from the master's negligence. 111 Ind. 212; 30 S. W. 679; 95 Ark. 291; *Id.* 477; 93 Ark. 102; 91 Ark. 102; 90 Ark. 223; 89 Ark. 424.

*Fred L. Purcell, B. L. Herring* and *T. D. Wynne,* for appellee.

1. It is elementary law that a plaintiff who alleges negligence must prove it by a preponderance of evidence, and the burden is on him to prove that the defendant was

guilty of some violation of duty. So, in this case, the presumption being that the master had performed his duty, it was necessary to overcome this presumption by positive proof, and it was right to so instruct the jury. 46 Ark. 555; *Id.* 570; Thompson on Neg. 1053; 45 Ark. 295; 41 Ark. 382.

2. Any objection to the form or phraseology of an instruction must be brought to the court's attention by specific objection. 80 Ark. 225, and cases cited; 89 Ark. 522, 529.

3. The question of negligence on the part of the defendant was one of fact for the jury, and their verdict is conclusive. 67 Ark. 531; 65 Ark. 116; 67 Ark. 433; *Id.* 399; 74 Ark. 478.

WOOD, J., (after stating the facts). The issues of negligence, contributory negligence and assumed risk, under the evidence, were questions for the jury. There was ample evidence to have sustained a verdict in favor of the appellants on the question of negligence; but, since the verdict of the jury was in favor of the appellee, the only question for our consideration is whether or not these issues were submitted upon proper instructions.

When the instructions given at the instance of the appellants and those given at the instance of the appellee are considered, as they should be, in connection with each other and as a whole, we are of the opinion that there is no reversible error in the court's rulings upon them, and they presented propositions that have been so often passed upon by this court, and that are so familiar to the profession, that we deem it unnecessary to discuss them at length.

No specific objection was urged at the trial, and on general objection to each of the instructions we are of the opinion that they were not calculated to confuse or mislead the jury, but, on the whole, that the charge fully and correctly submitted the issues.

Appellants urge that it was improper to tell the jury, in the first instruction, that they were to indulge the presumption that the defendant was not guilty of any negligent or careless act in reference to the cause of the death of Thompson, and that the burden was upon the appellants to overcome such presumption. But while this instruction was not happily worded, and, if specific objection had been made to it, might have been

presented in more correct form, it was nevertheless not inherently erroneous, and was manifestly intended by the trial court to announce the law as expressed by this court in *St. Louis, I. M. & S. Ry. Co.* v. *Gaines,* 46 Ark. 555, where we held that it is not sufficient merely to prove the injury and that it resulted from defective machinery, but that the plaintiff must further prove that it happened because the master did not exercise proper care in the premises. *St. Louis, I. M. & S. Ry. Co.* v. *Rice,* 51 Ark. 467.

The fourth instruction is not a correct definition of contributory negligence, and the instruction, in the absence of other instructions correctly defining negligence, would have been insufficient to have presented the question of contributory negligence; but, when this instruction is taken in connection with instructions that were given at the instance of the appellants defining negligence and contributory negligence, and also instructions Nos. 5 and 6, given at appellee's request, which contain a correct definition of ordinary care, or its counterpart, negligence, we are of the opinion that instruction No. 4 is not misleading, and that any objection to its verbiage or form merely should have been presented by a specific objection, and it doubtless would have been corrected so as to have met this objection. It was not inherently erroneous, and a general objection was not sufficient. See *Burnett* v. *State,* 80 Ark. 225; *Aluminum Co. of No. America* v. *Ramsey,* 89 Ark. 522.

Appellants complain of the latter portion of the fifth instruction given at appellee's request, because they say its language is clearly peremptory; but we are of the opinion that, when the concluding part of the instruction is read in connection with the first part of it, it is not open to the objection that it was argumentative or peremptory in its effect, nor do we think the instruction was abstract.

The objection to the seventh instruction is not well founded. There was some evidence to warrant the court in submitting to the jury the question as to whether or not Thompson negligently permitted his sleeve to be caught in the belt. The testimony of Ketchans, as set forth in the statement, was sufficient to warrant the submission of this question to the jury. It is not error for the court to give a specific instruction in a hy-

pothetical form covering the various phases of the evidence adduced. *St. Louis & S. F. Rd. Co.* v. *Crabtree,* 69 Ark. 134; *Taylor* v. *McClintock,* 87 Ark. 243.

The court did not err in excluding the testimony of the witnesses by which appellants sought to contradict the witness Ketchans. This examination was not responsive to any matter elicited by the appellee in its examination of the witness in chief, and was in regard to a matter that was entirely collateral and immaterial to the issue. It was not contended, and there was no evidence on the part of the appellant to show, that Thompson was inexperienced or ignorant. On the contrary, the uncontradicted proof was to the effect that he was a millwright and experienced in the work in which he was engaged at the time of his injury. A witness can not be impeached upon matters collateral to the issue. See *Hinson* v. *State,* 76 Ark. 366; *Hot Springs St. Ry. Co.* v. *Bodeman,* 76 Ark. 302; *McAllister* v. *State,* 99 Ark. 604.

The judgment is affirmed.