The State v. Pearce.

---

THE STATE OF KANSAS, *Appellee*, v. GEORGE L. PEARCE, *Appellant.*

No. 17,839.

### SYLLABUS BY THE COURT.

1. QUALIFICATION OF JURORS — *Opinion* — *Judicial Discretion.* Some of the persons called as jurors stated that they held opinions as to the guilt or innocence of the defendant, but upon a further inquiry, in which the judge took a leading part, the jurors answered that the opinions which they held were upon questions not in issue in the case. As the answers first given were contradictory of those subsequently made it devolved on the trial court to settle the contradictions and to

determine whether these persons held disqualifying opinions, and, there being evidence to support the findings of the court on the question, its decision must be affirmed.

2. DECLARATION OF DECEASED—*Testified to by Wife.* The declarations of a person who started from home with a herd of horses as to the place to which he was going and the purpose of his journey are admissible in evidence, and in a prosecution for the murder of the one who made such declarations testimony regarding them may be given by the wife of the deceased.

3. INCOMPETENT EVIDENCE—*Must be Prejudicial.* The admission of some incompetent testimony, which had little, if any, bearing on the issue being tried, and could not have influenced the verdict or prejudicially affected the interests of the party complaining, will not warrant a reversal of the judgment.

Appeal from Stanton district court. Opinion filed June 8, 1912. Affirmed.

*Joseph G. Waters, A. B. Reeves,* and *John C. Waters,* for the appellant.

*John S. Dawson,* attorney-general, and *S. M. Brewster,* special assistant attorney-general, for the appellee; *George Getty,* of counsel.

The opinion of the court was delivered by

JOHNSTON, C. J.: George L. Pearce shot and killed J. I. Silvey, and in a prosecution which followed he was convicted of murder in the first degree. In this appeal he insists that error was committed in selecting the jury and in the admission of evidence.

Appellant and Silvey lived in the same neighborhood, and Pearce had considerable unfenced leased land upon which Silvey's horses had grazed without the consent of Pearce. There had been some negotiations between them to the effect that Silvey should pay the taxes on the land for the privilege of using it but no agreement was reached. Pearce warned Silvey that he must desist from trespassing on his land, but it is

claimed that Silvey did not heed the warning. Although they had a number of conversations about the right to use the land their discussions were not very heated or angry. On the night before the killing appellant told Silvey to keep his horses off of the land and Silvey insisted that he had a right to some of the grass, and appellant replied that he had leased all the land he did not own and was entitled to the grass that grew on all of it. Appellant said Silvey "brought his fist down this way" (indicating) and that appellant "pushed" his "fist up this way" (indicating). On the next morning appellant climbed to the top of his windmill and from there discovered that Silvey's horses were being taken to or upon the land, and he came down, procured his gun, made inquiry about ammunition, and finding that some could be procured at a son's house a mile or more away he rode there, secured some cartridges, loaded his repeating rifle and proceeded toward the place where Silvey was seen in charge of his horses. No one, other than appellant, witnessed the shooting of Silvey. He stated that Silvey was riding a horse and moving slowly with the herd, and as appellant rode up Silvey rode away from him among the horses, and that when appellant spoke to him Silvey turned around and looked at him "in a sullen way" but did not speak, and that then appellant rode closer to Silvey and dismounted. He testified that Silvey then rode quickly towards him and said in an angry tone, "Hold up there!" that Silvey's left hand was down at his side as if drawing a weapon, and believing that he was in danger appellant lifted his gun and shot Silvey. Appellant did not report the killing to those whom he met, but Silvey was found soon afterwards lying on the ground face downward. He had been holding the bridle rein in one hand while he was on the horse, but he had fallen off, and it was found that he was without a gun and that a buggy whip was clutched in his hand.

After appellant fired the shot he said he discovered that Silvey was unarmed and that the shooting was unnecessary. Silvey was struck by a 30-30, soft-nosed bullet, and, according to the expert's testimony, the course of the bullet through his body was such that death must have been instantaneous.

The first complaint is that a number of persons who were called as jurors, and who by their answers had indicated that they had formed and expressed an opinion in the case, were held to be qualified jurors. Attention is called to the fact that with each summons served there was a notice signed by the judge telling the one served that he had been chosen as a juror in this case and not to talk with any one or allow any one to talk with him about the facts in the case nor to form or to express an opinion concerning the facts in the case. The notice was substantially in the form of the admonition given a jury after being impaneled. On the motion to quash the panel because of this unique notice the court filed a written statement that the admonition had been sent out:

"Because of developments on the former trial showing clearly an attempt on the part of counsel for defense to disqualify as many jurors as possible and to challenge all jurors who had heard of, talked about or who had expressed an opinion on any feature of the case; and because the court was reliably informed that the same tactics would be pursued in the second trial in impaneling the jury; and

"Because of the fear on the part of the court that too much general discussion might legally disqualify many of the jurors then competent, and prevent a trial of the case in Stanton county, the venue chosen by the defendant, and who objected to the removal of the case to any other county in the district where a fair and impartial jury could easily have been secured."

Following the filing of this statement counsel for defendant stated that:

"The defendant and his attorneys desire to say that so far as the conduct of the judge in issuing the 'Ad-

monition' is concerned, that it was done in the best of faith, for the purposes and under the circumstances stated by him above, and that the only reason for filing the motion was simply the legal proposition, as we thought it to be, that nothing can be done in a criminal case without the presence of defendant."

Although the notice sent out was unusual it betrayed no prejudice and its only tendency was towards preventing the possible disqualification of those summoned as jurors. The circumstances were peculiar as there had been one trial of the case and there were only a small number of persons in the county who could be required to act as jurors. The notice indicated a desire on the part of the court to obtain a qualified jury and, at any rate, it is impossible to see how his act could have operated to the prejudice of the appellant.

Complaint is made of the overruling of fifteen challenges of persons who, it is alleged, were incompetent because of opinions entertained and expressed, but the discussion in the brief is principally confined to three of them. One of these was named Schwerkhard, who had been at Silvey's house after the shooting, had seen the dead body, and talked with people there about the tragedy. He stated that he had an opinion as to the killing of Silvey and as to who had killed him. Sometimes, in answer to questions, he would state that he had an opinion as to the guilt or innocence of appellant and that it would remain with him, and also that he understood the full force of the question asked him; but, on further inquiry, he stated that he meant that the opinion which he had was that Silvey was dead and that appellant had killed him. That appellant had shot and killed Silvey was not an issue in the case. It was a fact which was expressly admitted by appellant in his testimony. The only question in the case was whether it was done in self-defense, and as to that the juror said he had an open mind. It is true that some of the questions asked by the court were suggestive, but on the whole examination the question whether the

juror held a disqualifying opinion was fairly one of fact, and it can not be said that there is not substantial testimony to sustain the ruling on the challenge. It is true that there were contradictory answers given by the juror concerning his opinion, but this alone does not prove him to be disqualified. (*The State v. Labore,* 80 Kan. 664, 103 Pac. 106.) It was the province of the court to settle the contradictions and to determine upon the testimony whether he had disqualifying opinions and whether he was free from bias, prejudice, or interest. As was decided in *The State v. Stewart,* 85 Kan. 404, 116 Pac. 489, the finding of the district court on this question is to be reviewed the same as any other finding of fact based on contradictory or conflicting evidence, and the finding must stand unless disqualification appears as a matter of law or that there has been an abuse of its discretion.

It is unnecessary to recite the testimony as to the disqualifications of others who were challenged, but after a careful reading of that printed in the abstracts it must be held, within the rules laid down in *The State v. Stewart,* supra, and the cases there cited, that no material error was committed in the impaneling of the jury.

Error is assigned on the admission of the testimony of Mrs. Silvey, the wife of the deceased, to the effect that on the morning of the shooting Silvey started with the horses and stated to her that he was going to take them to graze on the Silknitter tract of land. There is nothing in the criminal code which bars her from being a witness for the state or from testifying to any fact of which she has knowledge. The legislature has removed restrictions by providing that no person is incompetent to testify in a criminal case by reason of being the party injured or defrauded, or intended to be injured or defrauded, or by reason of being the husband or wife of the accused, and that either may voluntarily testify in behalf of the other but can not

be compelled to testify against each other. (Crim. Code, § 215.) The civil code, to which reference is made, was so modified in the revision that a husband or wife is only declared to be incompetent to testify as to communications made by one to the other during marriage where they are called to testify for or against each other. (Civ. Code, § 321.) If this section were deemed to apply (and it does not), it would not operate to exclude the testimony of Mrs. Silvey as she was not asked to testify against or for her husband. There is, therefore, no statutory disqualification of the witness, but it is contended that she is incompetent to testify under the principles of the common law. This rule, if controlling, only makes the husband or wife incompetent to testify for or against each other. It is argued, too, that, being a communication between husband and wife, it is to be regarded as privileged on the grounds of public policy and is to be kept inviolable forever in courts of justice. This privilege extends only to marital communications, and its admissibility depends on the inherent character of the communication. If it is not inspired by the marital relation, nor of a confidential character, its disclosure is not contrary to public policy. It is difficult to find anything in the communication challenged which can be construed in a marital sense, as private or confidential, or which would have embarrassed or disturbed the marital relations between the Silveys.

Apart from these objections, it is urged that the testimony of the witness was a declaration made in the absence of the defendant and can not be regarded as a part of the *res gestæ*. The purpose of the testimony appears to have been to show that Silvey had started with his horses to the Silknitter pasture instead of to that of the appellant. If it was material, as it may have been when it was introduced, the testimony was admissible. Statements of one starting on a journey as to where he came from and where he is

going are, ordinarily, admissible in evidence as a part
of the *res gestæ*. (*The State v. Vincent,* 24 Iowa, 570;
*Autauga County v. Davis,* 32 Ala. 703; *Kilgore v. Stan-
ley,* 90 Ala. 523, 8 South. 113; *The State v. Gabriel,* 88
Mo. 631; *Hunter v. State,* 40 N. J. Law, 495; *State v.
Howard,* 32 Vt. 380; *Commonwealth v. Webster,* 59
Mass. 295.)

In our opinion Mrs. Silvey was a competent witness,
the communication was not a privileged one, and the
declaration of her husband when starting on the jour-
ney characterized and explained the act of going and,
being a part of that act, was admissible in evidence.
Even if the testimony had not been competent it must,
nevertheless, have been held that it was not prejudicial
to the rights of the appellant. In view of the ad-
missions of the appellant and his testimony describing
the acts of Silvey and the circumstances preceding the
shooting, the statement of Silvey as to where he was
going that morning appears to be of little importance.
Whether Silvey had in mind to go to the Silknitter
pasture or to take his horses elsewhere had no bearing
on the conduct of the parties when they met. The
state of mind of the appellant was material, but what
was in Silvey's mind that morning, or what was said
by him to his wife on starting out with his horses, was
not communicated to appellant, and even if it had been
it would have afforded him no excuse for shooting
Silvey. According to appellant's testimony there was
nothing menacing in Silvey's acts or attitude until ap-
pellant challenged him, nothing indicating hostility
until appellant dismounted with a rifle in his hand, and
then he says that Silvey rode rapidly towards him, 'ex-
claiming, "Hold up there!" While he states that Silvey
appeared to have one hand down at his side, as if
reaching for a weapon, Silvey was, in fact, holding the
bridle rein in one hand and a buggy whip in the other,
and this situation must have been reasonably manifest
to appellant. He admits that he took the rifle with

him that morning thinking that he might have occasion to use it, and with the idea that as Silvey had been a little angry the night before he "might be in a bad state of mind, if I undertook to put his horses back." Although he stated that he was without malice towards Silvey, one of the reasons he gave for the shooting was that he was provoked at the way Silvey trespassed upon his pasture. The testimony of appellant, as well as of the other witnesses, makes it very clear that the statement of Mrs. Silvey, if treated as inadmissible, is immaterial and could have no effect upon the verdict.

These are the only grounds upon which a reversal is asked, and as neither is deemed to be sufficient to warrant the setting aside of the conviction the judgment of the trial court is affirmed.