SPIVEY AND LYNCH *v.* STATE.

Opinion delivered September 28, 1914.

1. EVIDENCE—NARRATIVE OF PAST EVENTS.—Narrations of past events are not admissible under the *res gestae* doctrine.

2. EVIDENCE—LETTERS OF DECEASED—ADMISSIBILITY.—In a prosecution for homicide, letters written by deceased to his daughter, stating that he was going to defendant's house pursuant to an agreement, and might be killed, *held*, not admissible in evidence as part of the *res gestae*.

3. EVIDENCE—NARRATION OF PAST EVENTS—RES GESTAE—ADMISSIBILITY.— In a prosecution for homicide, statements written by deceased in a diary, as to events which occurred upon the occasion of a previous visit to defendant, are inadmissible in evidence, as part of the *res gestae*.

4. EVIDENCE—RES GESTAE—NARRATIVE OF PAST EVENTS.—In a prosecution for homicide, evidence of statements made by deceased as to the object and purpose of his going to defendant's house held inadmissible, not being part of the *res gestae*.

5. EVIDENCE—TELEPHONE CONVERSATION.—In a prosecution for homicide, the daughter of deceased may testify as to what deceased said in a telephone conversation with defendant, when it is shown by other evidence that deceased and defendant did hold a telephone conversation at the time testified to.

6. EVIDENCE—COLLATERAL PROCEEDING AGAINST DEFENDANT.—In a prosecution for homicide, the pleadings in another action, wherein defendant was seeking a divorce from deceased, are inadmissible in evidence.

7. EVIDENCE—PLEADINGS AS EVIDENCE.—The statements made in the answer and cross-complaint in an action for divorce are *ex parte* statements, and are not evidence of the truth of the matters alleged therein.

8. EVIDENCE—HOMICIDE—RELATIONSHIP OF DECEASED AND DEFENDANT— MOTIVE.—In a prosecution for homicide, it is competent to show the pendency of a suit for divorce between deceased and defendant, as a fact to show the feeling and relationship between the parties, together with evidence of the grounds of the complaint or cross-complaint, as indicating the motive for the killing.

9. EVIDENCE—HOMICIDE—CONSPIRACY—MOTIVE.—One S. was charged with the crime of killing his stepfather, and his mother was charged with assisting in the crime. *Held*, evidence of the pendency of a suit for divorce between deceased and S.'s mother is admissible in a prosecution of S., under the theory that the killing was done in pursuance of a conspiracy.

Appeal from Monroe Circuit Court; *Eugene Lankford,* Judge; reversed.

*Roy D. Campbell* and *Thomas & Lee,* for appellants.

1. The testimony of the witness, Mabel Lynch to the effect that she heard the deceased talking over the telephone on Wednesday night before the killing to some person unknown to her, was incompetent and should have been excluded. 12 Cyc. 423; 3 N. Y. Cr. Rep. 483; 31 Tex. Cr. Rep. 349, 20 S. W. 753. See, also, 1 R. C. L., 477, § 13; 74 Pac. 275; 94 Ark. 404.

2. The court erred in admitting as evidence the notes of deceased to his daughter, dated May 7 and May 9, 1913, and the two entries dated May 7 and May 9, 1913, found in the diary of the deceased after his death. The writing of a deceased person is no more admissible evidence than his unsworn declarations while living. 23 Ark. 131. The notes to the daughter are incompetent to prove the matter contained therein, because they are mere hearsay and *ex parte* statements. 89 Ark. 471. And neither the notes nor the entries in the diary are admissible as part of the *res gestae.* 43 Ark. 100; Wharton, Cr. Ev. (9 ed.), § § 262, 263; 2 Bishop, Cr. Proc., § 625; 1 *Id.,* § 1086; 88 Ark. 454; 85 Ark. 479; 43 Ark. 292; 48 Ark. 333; 58 Ark. 272; 9 Am. & Eng. Enc. of L. 677; 24 Cal. 640.

3. It was error to admit as evidence conversations detailed by the witness Trice as having been had with the deceased on Wednesday and Friday before the killing. The conversations were not had in the presence of the defendants, nor communicated to them, and they were clearly not a part of the *res gestae.* 21 Cyc. 931; 94 Ala. 9; 145 Cal. 717; 141 Ill. 75; 84 Miss. 414; 163 U. S. 612; 26 Cent. Dig., tit. "Homicide;" 89 Ill. 90.

4. The court erred in permitting the clerk to read, as a part of his evidence, the pleadings in the divorce case pending between the deceased and Mrs. Lynch. The pendency of a divorce suit by the wife against the husband may be shown by parol as indicating a motive for the killing of the husband by the wife, but the record of the suit is not admissible. 57 Ind. 46; 66 Ind. 430; 13 Tex.

App. 478; 1 McLain's Cr. Law, § 416; 93 Mo. 193, 6 S. W.
118; 102 Mass. 1.

The pleadings in the suit of Mrs. Lynch against deceased would not be admissible for any purpose as against the defendant Spivey. 21 Ark. 329; 14 Ark. 640; 15 Ark. 280; 17 Ark. 60.

*Wm. L. Moose,* Attorney General, and *Jno. P. Streepey,* Assistant, for appellee.

1. There is evidence in the record connecting Mrs. Lynch with the telephone conversation overheard by the witness Mabel Lynch, sufficient to make her testimony admissible on that point.

2. The facts set out in the notes and in the entries in deceased's diary were proved by other evidence in the case; hence their introduction as evidence, if erroneous, was not prejudicial. 108 Ark. 191. But it was not error to admit them in evidence. Declarations of the deceased person in a homicide showing that he was about to set out for the place where he was slain, have long been held to be admissible as explanatory of his purposes in going to the particular place. 96 Ala. 24; 90 Ala. 523; 27 Ala. 1; 13 Tenn. 259.

3. The testimony of witness Trice relative to what deceased told him was admissible for the same reason that the notes and diary entries were admissible.

4. The pleadings in the divorce case were admissible to show the motive impelling the appellant Mrs. Lynch to commit the crime.

HART, J. The defendants, Robert Spivey and Lillie D. Lynch, were indicted for the crime of murder in the first degree, charged to have been committed by Robert Spivey shooting R. C. Lynch while Lillie D. Lynch was present aiding and abetting him. The defendants were tried before a jury and convicted of murder in the second degree, their punishment being fixed at five years in the State penitentiary. From the judgment of conviction, they have duly prosecuted an appeal to this court.

The facts, so far as are necessary for a determination of the assignments of error presented, briefly stated, are as follows:

Robert C. Lynch was shot by Robert Spivey, between 10:30 and 11 o'clock p. m., on the 9th day of May, 1913, just after he entered the home of Lillie D. Lynch, in Monroe County, and was instantly killed. At the time he was the husband of Lillie D. Lynch and Robert Spivey was his stepson. Robert C. Lynch had been formerly married, and by his first wife had reared a family of girl children, all of whom were grown at the time he was killed. He separated from his first wife, and she brought suit for divorce against him. During the pendency of the suit, he boarded with the defendant Lillie D. Lynch, who was then Lillie D. Spivey. His first wife was granted a decree of divorce, and about twenty days thereafter he married Lillie D. Spivey and they moved to her farm in Monroe County, Arkansas, where they resided for about two years until their separation in the month of September, 1912. During their residence on the farm of the defendant Mrs. Lynch, Robert C. Lynch managed it. In October, 1912, the defendant Lillie D. Lynch instituted a suit for divorce against him, and also sought the recovery of certain property which she alleged Robert C. Lynch had taken from her farm and disposed of for his own use and benefit. This suit was pending at the time Robert C. Lynch was killed. During the pendency of the suit, Robert C. Lynch visited the defendant Lillie D. Lynch at her home. According to witnesses for the State, he visited her at least once a week, and their relations were friendly. According to the testimony of the defendants, he did not visit her more than once or twice a month, and during these visits they had quarrels about the division of the property, and their relations were confined to a discussion of their property affairs. Mrs. Lynch occupied as a bedroom one of the front rooms of the house, and her son, Robert E. Spivey, who was about thirty-five years of age, slept in the room immediately back of her bed-room. On the night Robert C. Lynch was killed, he entered the house

through a window in the room across the hall from the bedroom of Mrs. Lynch, between 10:30 and 11 o'clock p. m. Just after he entered the room, he was shot and killed by Robert E. Spivey. Mrs. Lillie D. Lynch was present.

At the time Robert C. Lynch was killed he had on an overcoat, which was buttoned up. In a pocket of the overcoat was a linen mask to which strings were attached. In another pocket was found an electric searchlight. Near the feet of deceased's body was found a .38 calibre pistol, cocked and on safety, the magazine filled with cartridges, and one of the cartridges in the barrel of the pistol. A large dirk was stuck down in the waist band of his trousers and supported by his suspenders. He had on a suit of winter underclothes, no top shirt or coat, and a pair of low-quarter shoes, over which were worn a pair of high top arctic overshoes.

The southwest window and screen of the room in which he was killed had been raised. The deceased's body was found lying crumpled up, face downward, near the raised window. His hand was partly under his body. A load of buckshot had entered his right breast just below the nipple, in a space three and one-half or four inches in circumference.

The theory of the State was that the defendant Lillie D. Lynch had an understanding with her son, Robert E. Spivey, that she would invite the deceased to her home on the night of the killing, that the deceased should enter the southwest window of the west room, and that upon his entering the room, defendant Spivey should shoot the deceased with his shotgun, that it might appear that the deceased had been killed by Spivey in the defense of their home. Evidence was adduced by the State to support this theory.

The theory of the defense was that the deceased came to the home of defendant without the knowledge of either of them, and for the purpose of obtaining certain papers which the defendant Lillie D. Lynch had in her possession, and which pertained to the litigation between them, and that the defendant Robert E. Spivey shot him in the

defense of their home, not knowing who he was nor for what purpose he had entered the house. Robert E. Spivey testified, in brief, that he was living with his mother at the time the deceased was killed; that the deceased had not been in the habit of visiting his mother at night since her separation from him; that on the night of the killing, his mother came into his room where he was sleeping, and told him to get up, that some one was breaking into the house; that he asked her where, and she told him in the west front room; that he got up, got his gun, and went out into the hall to the front room door; that he saw the bulk of something that looked like a man over near the window; that he fired two shots at him with his shotgun, and then ran out into the yard and rang a bell to alarm the neighbors; and that he did not know who it was who had entered the room, and had no suspicion whatever that it was the deceased, and no knowledge whatever that the deceased contemplated coming to the house that night.

The deceased was killed on Friday night, May 9, 1913. At the time of his death, he resided in Cotton Plant and lived in an office just in the rear of the home occupied by his former wife and daughters. On Wednesday prior to the killing, the deceased wrote a note to his daughter Mabel, which is as follows: .

"May 7, 1913.

"Wednesday evening, 8 o'clock p. m.

"Am going to Saulsberg. Lillie has promised me this evening while there, if I would come back at 10 o'clock tonight she would raise the west parlor window and let me in. I could stay until daylight with her in the parlor, and no one would know I had been there. It may be a job up to assassinate me. If so, I have told Ben Trice all about the arrangements, and am going, so if I never come home alive, bury me by my loved ones.

"Your loving father,

"Robert C. Lynch."

Written on the back is the following note:

"I left this on my desk for Mabel, but as I did not go, went with Mabel to the picture show.

"R. C. Lynch."

The deceased did not go to see the defendant Lillie D. Lynch that evening, but instead went with his daughter to a picture show. The evidence for the State shows that Mrs. Lynch telephoned him on that evening not to come, but to defer his visit until a later time to be fixed by her. The note which the deceased wrote to his daughter was not delivered to her, but was left in his desk where she found it on the morning after he was killed. On the night he was killed, he wrote his daughter another note which he left in his desk, and which she found there on the morning after he was killed. That note reads as follows:

"Friday night, May 9, 1913.

"Mabel: If I do not get back tonight, look for me at Saulsberg; have an engagement with Lillie, in the parlor at 10:30 tonight. Will ride 'Nip.'

"Father."

It appears, also, that the deceased kept a diary which was found in his desk by his daughter after his death. An entry in his diary of the date of May 7, 1913, reads as follows:

"Wednesday, May 7, 1913.

"Phone rang and Lillie says, 'You know the business we were talking about?' 'Yes.' 'Will have to postpone until later, and not to come.' I told her I was ready to go. 'Wait until I can see you,' she answers. 'Your pleasure is my happiness,' so I did not go to Saulsberg tonight. Mabel came in office when I was pulling off my heavy clothing and overshoes. Told Ben Trice of the trip, and he advised against it, saying, 'You don't know what you will run up against.'"

It also appears than an entry was made in his diary of the date of May 9, 1913, on which day the deceased visited the defendant Lillie D. Lynch at her home, and the entry in the diary purports to be a statement of what

they did and said during that visit. He sets out in detail their lascivious conduct on the occasion of the visit, and states that the room was to be arranged so they might have sexual intercourse on his next visit. He also expresses a suspicion that he might be killed on the next visit, but said he was going to make it.

The letters and the contents of the diary were introduced in evidence over the objection of the defendants, and they assign the action of the court as an error for which the judgment should be reversed.

The Attorney General contends that the testimony was admissible as part of the *res gestae*. It is not possible to define accurately the declarations which should be treated as parts of the *res gestae*. The decisions of the courts of the different States are sometimes perplexing, and are often irreconcilable. But certain general principles are regarded as well settled.

In discussing the subject of *res gestae*, Mr. Wharton says: "The distinguishing feature of declarations of this class is that they should be the necessary incidents of the litigated act; necessary in this sense, that they are a part of the intermediate concomitants or conditions of such act, and are not produced by the calculated policy of the actors. They must stand in immediate causal relation to the act, and become part, either of the action immediately producing it, or of the action which it immediately produces. Incidents that are thus immediately and unconsciously associated with an act, whether such incidents are doings or declarations, become in this way evidence of the character of the act." Wharton's Criminal Evidence (10 ed.), vol. 1, page 504. See, also, Greenleaf on Evidence (15 ed.), vol. 1, § 108.

Again, Mr. Wharton, in discussing declarations and occurrences, as *res gestae,* says: "It is essential, however, to the admission of declarations under this exception, that they should have emanated instinctively from the act put in evidence. If they were before or after it, so as to be open to the suspicion of being self-serving, they are to be excluded. They are admissible, because

they are so wrought up in the body of the act that they can not be separated from it. In such cases, the act is part of the declaration and the declaration part of the act. The words and deeds form part of a common mass of signs which can not, in this sense, be distinguished." Wharton's Criminal Evidence (10 ed.), vol. 1, page 508.

In the case of *Carr* v. *State,* 43 Ark. 99, the court said: "*Res gestae* are the surrounding facts of a transaction, explanatory of an act, or showing a motive for acting. They are proper to be submitted to a jury, provided they can be established by a competent means, sanctioned by the law, and afford any fair presumption or inference as to the question in dispute."

It is urged by the Attorney General that the letters of the deceased to his daughter and the entries of his diary admitted in evidence were admissible under the principles laid down in the cases of *Hunter* v. *State,* 40 N. J. L. 495, and *State* v. *Pearce,* 87 Kan. 457, 30 Am. & Eng. Ann. Cases, 358, and case note. In these cases, and other cases of like character, it was held that statements of one starting on a journey as to where he came from, and where he was going are ordinarily admissible in evidence as a part of the *res gestae.*

The case of *Hunter* v. *State, supra,* contains an exhaustive and well reasoned discussion of the subject. The reason given for the admission of such testimony is that in the ordinary course of things, it was the usual information that a man about to leave home would communicate for the convenience of his family, information of his friends or regulation of his business. That is to say, the statements of the declarant as to where he was going explained his act of going, and, being a part of that act, excluded the evidence of design on his part, and are, therefore, admissible in evidence.

(1-2-3) It has been universally held, however, that narrations of past events are not admissible under the *res gestae* doctrine. So, also, expressions by the deceased of suspicions that he might be killed were simply expressions of his own state of feeling toward the defendant,

and did not, in any sense, characterize and explain his act in going to the home of the defendant. Surmise or suspicion as to what might happen to him, should he go to the home of the defendant, did not in any manner characterize or explain his act of going, and are not a part of that act. Therefore, under the well-settled rules of evidence laid down by the text writers and the adjudicated cases, they were not admissible in evidence. Neither was the declaration of the deceased as to what occurred when he visited the home of the defendant in the day time before he was killed that night, admissible as part of the *res gestae*. They were simply narrations of past events, and might have been made by design.

Under the cases relied upon by the Attorney General, it was permissible to prove the declarations of the deceased to the effect that he was going to the home of the defendant Lillie D. Lynch, to visit her. But his statements of what occurred on a previous visit and his suspicions of what might occur on a future visit were not admissible in evidence, and for the error in admitting them, the judgment must be reversed.

(4) The trial court also permitted a witness on behalf of the State to testify that he had had a conversation with the deceased prior to his going to the home of the defendant Lillie D. Lynch, and that the deceased had told him the object and purpose of going there, and the manner of his entrance which had been agreed upon between him and the defendant, Lillie D. Lynch. For the reason given above, the witness should have only been permitted to state that deceased told him that he was going to the home of Lille D. Lynch, to visit her.

(5) It is also objected by counsel for defendant that the court erred in permitting evidence of a telephone communication between the deceased and the defendant Lillie D. Lynch. The daughter of the deceased testified that on Wednesday evening preceding the killing, she was in her father's office and heard him say over the phone: "Hello, you say not come—you say not come tonight? All right, you let me know; good-by." It is urged by

counsel for defendant that this testimony should not have been admitted, because there was nothing to show that the defendant Mrs. Lynch was the person to whom her father was talking at the time. The State, however, proved by the telephone operator that Mr. Lynch had a conversation with his wife on that evening, and that the records of their office show a telephone call between Mr. and Mrs. Lynch on that evening at about the same hour as that testified to by the daughter of the deceased, and also that Mr. and Mrs. Lynch were accustomed to talking to each other over the telephone. This testimony sufficiently identified the conversation over the telephone. In Ruling Case Law, vol. 1, paragraph 13, page 477, the rule is stated as follows: "Communications through the medium of the telephone may be shown in the same manner, and with like effect, as conversations had between individuals face to face. But the identity of the party against whom the conversation is sought to be admitted must be established by some testimony, either direct or circumstantial; to hold parties responsible for answers made by unidentified persons opens the door for fraud and imposition." See, also, 12 Cyc. 423.

(6-7) Over the objection of the defendant, the State was permitted to introduce in evidence the proceedings in the divorce case, including the complaint of Lillie D. Lynch, and the answer and cross complaint of Robert Lynch. The suit for the divorce was a collateral proceeding, and the court should not have allowed these pleadings to be introduced in evidence against the defendants. This is especially true in regard to the answer and cross complaint of the deceased, Robert C. Lynch. The statements made in his answer and cross-complaint for divorce were merely his *ex parte* statements, and were not evidence against the defendants of the truth of the matters alleged therein.

(8) As a fact to show the feeling and relation of the parties to each other, it was competent to show the pendency of the divorce suit between them. The pendency of the suit, the parties to it, and the grounds of the com-

plaint or cross-complaint, whether for desertion, adultery, cruel treatment, etc., might properly have been admitted in evidence as showing the state of feeling between the parties and as indicating the motive for the killing. *Binns* v. *State,* 57 Ind. 46; *Pinckord* v. *State,* 13 Texas Court of Appeals 468; McClain on Criminal Law, vol. 1, § 416.

(9)   This evidence would also have been competent against the defendant Robert E. Spivey, because, under the theory of the State, a conspiracy to kill the deceased had been formed between the defendants to this action.

Other assignments of error have been pressed upon us for a reversal of the judgment, but we do not deem it necessary to determine them, for they are not likely to occur on a retrial of the case.

For the error in the admission of the testimony as indicated in the opinion, the judgment will be reversed, and the case remanded for a new trial.