## SULLIVAN *v*. STATE.

### Opinion delivered September 27, 1926.

1. HOMICIDE—EVIDENCE—MOTIVE FOR KILLING.—In a prosecution for murder, testimony of deceased's children that, about a week before the killing, their father told defendant that he was liable to get in trouble about having forged deceased's name to a note, was relevant to prove the State's theory that the defendant's motive was fear of prosecution for forgery.

2. HOMICIDE—MOTIVE FOR KILLING.—Where the purpose of evidence is to disclose a motive for the killing, the courts are very liberal in permitting its introduction, and anything and everything that might have influenced the prisoner to act may, as a rule, be shown.

3. CRIMINAL LAW—RES GESTAE.—In a prosecution for murder, testimony that deceased told witness, when he started from home on the day that he was killed, that he was going to see defendant about a bill of lumber was competent as part of *res gestae*.

4. WITNESSES—IMPEACHMENT ON CROSS-EXAMINATION.—In a prosecution for murder, it was not error to permit defendant to be cross-examined as to how many men he had shot at, if he was permitted to explain the circumstances of the shooting.

5. HOMICIDE—INSTRUCTION AS TO SELF-DEFENSE.—An instruction that, to justify homicide, it must appear that the circumstances were

sufficient to excite the fear of a reasonable person, acting without fault or carelessness, and that the party killing really acted on their influence and not in a spirit of revenge, *held* correct, and a requested modification that "it must appear that the circumstances were sufficient to excite the fears of the defendant acting as a reasonable person" was properly refused.

6. HOMICIDE—SELF-DEFENSE.—Whether defendant acted as a reasonable man and without fault or carelessless must be determined by the jury from the facts and circumstances in the case from the viewpoint of the defendant, or as they might have appeared to the defendant.

7. HOMICIDE—SELF-DEFENSE—INSTRUCTION.—An instruction that, if defendant, armed with a deadly weapon, sought or brought on, or voluntarily entered into, a difficulty with deceased with felonious intent to take his life, he could not invoke the law of self-defense, no matter how imminent the peril in which he found himself placed, unless he abandoned or attempted to abandon the conflict before the mortal shot was fired, *held* applicable to the facts proved by the State.

8. CRIMINAL LAW—REPETITION OF INSTRUCTIONS.—It was not error to refuse a requested instruction which was covered by other instructions given.

Appeal from Miller Circuit Court; *James H. McCollum,* Judge; affirmed.

*Pratt P. Bacon,* for appellant.

*H. W. Applegate,* Attorney General, and *Darden Moose,* Assistant, for appellee.

WOOD, J. Appellant was convicted in the Miller Circuit Court on an indictment which correctly charged him with the crime of murder in the first degree in the killing of one John Gibson. He was found guilty by the jury of the crime of murder in the first degree, and his punishment fixed at life imprisonment in the State Penitentiary.

From a judgment sentencing the appellant according to the verdict, he prosecutes this appeal.

The testimony of H. L. Burton, for the State, was substantially as follows:

The witness was with Gibson, the deceased, on December 25, 1925, from about 12 o'clock noon until he was killed. The witness met Gibson at his home. They

went to Ravana in witness' car. Gibson asked the witness to stop at Sullivan's house, and witness drove by Sullivan's house and stopped his car. Gibson got out of the car, and went into the house. The witness heard the report of a gun. The witness sat in the car, and saw Sullivan come out of the south end of his house, which was the back part. The house faces the road north. Sullivan met his wife, 20 or 30 steps from the house, and said to her, "I killed him. I shot him through the heart." The witness then went in the house and found Gibson in the room, dead. He was leaning against the bed, shot through the heart. His hands were down by his side. The witness' car was about 50 steps from where Sullivan met his wife. Sullivan did not have a gun when the witness saw him. The witness described the house where Sullivan and his family lived. The house faced the road, and there were two rooms 16x16, with a hall between: The killing occurred in Miller County, Arkansas.

Over the objection of appellant the court permitted Jasper, Eva, Addie and Effie Gibson, children of the deceased, to testify to remarks made by their father in a conversation with Sullivan on the 19th day of December, 1925, which is as follows:

"Well, Mr. Sullivan, I want to see you about that feed bill you owe up there at Mr. John Simmons' that I stood for. It's about time it was being paid off. I owe a bill up there myself, and I would love for you to see if you can't dig me up some money on that. I thought I would drop down and see if you could dig me up some money on that feed bill. It's about time it was being paid. While I think about it, Willis jumped me about that note you forged my name on up there. You ought to see something about that. You are liable to get in trouble about it. I ain't got nothing to do with it myself; that is left up to you and Willis."

The defendant duly excepted to the ruling of the court in admitting the above testimony.

Over the objection of appellant, the court permitted Jasper Gibson to testify that, on the day of the killing, his father went to appellant's house to see him about some lumber. The witness stated that he knew this from what his father told him.

The appellant duly excepted to the ruling of the court.

The witness, Fred Brimmer, over the objection of appellant, was permitted to testify that he was at the home of John Gibson, the deceased, on the morning that he left for Ravana, the day that he was killed. Gibson had started to Ravana to see Sullivan, the appellant, about a bill of lumber. The witness was asked, "How do you know that?" and answered, "He told me."

The appellant duly excepted to the ruling of the court in admitting this testimony.

Over the objection of the appellant he was asked, on cross-examination, "How many different men have you shot or shot at?" The court ruled that the appellant might answer the question, and that the jury might consider that "only in passing on this man's credibility as a witness."

The appellant duly excepted to the ruling of the court.

Over the objection of appellant the court, among other instructions, gave the following:

"6. The bare fear of those offenses to prevent which the homicide is alleged to have been committed shall not be sufficient to justify the killing. It must appear that the circumstances were sufficient to excite the fear of a reasonable person, acting without fault or carelessness on his part, and that the party killing really acted on their influence and not in a spirit of revenge."

The appellant asked the court to amend the above instruction by adding the following: "It must appear that the circumstances were sufficient to excite the fears of the defendant, acting as a reasonable person."

The appellant duly excepted to the ruling of the court in giving the instruction, and in refusing to add the qualification.

Over the objection of appellant the court gave the following instruction, to which appellant duly excepted:

"11. If you believe from the evidence in this case, beyond a reasonable doubt, that the defendant, armed with a deadly weapon, sought or brought on or voluntarily entered into the difficulty with deceased, with felonious intent to take his life, then the defendant cannot invoke the law of self-defense, no matter how imminent the peril in which he found himself placed, unless he abandoned or attempted to abandon the conflict before the mortal shot was fired."

The appellant's prayer for instruction No. 14 is as follows:

"If you believe from the evidence that the defendant was in his home, and in good faith, and as a reasonable man, believed that deceased intended to kill him or do him some great bodily harm, and, while so in his home, deceased came there and entered the house in a violent and threatening manner, thrust his hand into his pocket, and if defendant, as a reasonable man, believed that deceased intended to kill him, or do him some great bodily harm, and, acting under the influence of such belief, defendant fired the fatal shot, the killing would be justifiable, in viewing the circumstances from defendant's standpoint, if it appeared to him, as a reasonably prudent man, acting without fault or carelessness, he believed that it was necessary to kill deceased in order to save his own life or prevent great bodily harm being done him."

The court refused his prayer, to which ruling the appellant duly excepted.

We will consider the above assignments of error in the order urged by appellant's counsel in their brief.

1. It was not error to permit the Gibson children to testify that, on the 19th of December, 1925, in a conversation between their father, the deceased, and appellant, they heard their father use the language to the appellant as already set forth.

One of the witnesses for the defendant testified that, just as Gibson came along in the car, the witness saw the defendant, Sullivan, come through his house with what looked like a shotgun in his hand.

One of the witnesses for the State testified that Sullivan told the witness, on the morning before the killing occurred, that "they thought that they had him in their boat, but, before he would go to the penitentiary over anything, he would kill the whole bunch."

Another witness for the State testified that, on Christmas Eve night, Sullivan told the witness to tell John Gibson, the deceased, "to come down to his house tomorrow, that he wanted to see him on some particular business." The witness further testified that he went by John Gibson's home that night and delivered the message.

It was the theory of the State that the motive of appellant in killing the deceased was because he feared he would be prosecuted for the crime of forgery, and, if so, the deceased would be a material witness against him.

It appears from the testimony of the witnesses just quoted that this theory of the State was justified, and therefore the testimony of the children of Gibson as to the conversation between him and the defendant, Sullivan, a few days before the killing as above detailed, was relevant to the issue. The appellant himself, on cross-examination, was asked the following question, "And you killed him because he came to your house, did you, that night?" He answered, "I reckon I did. I told him not to come to my home. He came there. What else was I going to do—go off and leave her in the house?"

It was the contention of appellant, as shown by his testimony, that he killed Gibson because he feared that illicit relations existed between him and appellant's wife, and because he had told the deceased to stay away from his home, and because the deceased came to appellant's home and was making a demonstration at the time appellant shot him, as though he was going to draw a weapon from his pocket.

In *Sneed* v. *State,* 159 Ark. 65-74, 255 S. W. 895, we said: "While it is competent to prove the presence or absence of motive in determining the issue of guilt or innocence, and while such proof always is a cogent factor relative to that issue, yet, if the testimony be otherwise legally sufficient to prove guilt, a verdict of guilty cannot be set aside because of failure to prove a motive for the crime."

It will be observed that there was a sharp conflict between the appellant and the State as to the motive actuating appellant in the killing of Gibson. The testimony of Gibson's children, as above detailed, was relevant testimony tending to prove that the motive of the appellant in the killing of Gibson was as contended by the State, and the court therefore did not err in admitting the same.

In 13 R. C. L., 910, § 214, it is correctly declared that: "Where the purpose of evidence is to disclose a motive for the killing, the courts are very liberal in permitting its introduction, and anything and everything that might have influenced the prisoner to commit the act may, as a rule, be shown." Many cases are cited in the note to sustain the text.

See also 30 C. J. 179, § 406, and *Stokes* v. *State,* 71 Ark. 113, and at p. 117, 71 S. W. 248, where we quoted from Mr. Wills on Circumstantial Evidence as follows: "It is indispensable, in the investigation of imputed guilt, to look at all the surrounding circumstances which connect the actor with other persons and things, and may have operated as motives and influenced his actions."

2. The testimony of Fred Brimmer to the effect that the deceased, Gibson, told him, when he started from his home on the day that he was killed, that he was going to Ravana to see Sullivan about a bill of lumber, was relevant testimony, and the court did not err in admitting the same under the doctrine announced by this court in *Spivey and Lynch* v. *State,* 114 Ark. 267-175-276, 169 S. W. 949.

In the above case, at p. 275, we cited cases holding "that statements of one starting on a journey as to where he came from and where he was going, are ordinarily admissible in evidence as a part of the *res gestae;*" and we said, on p. 276, under the cases relied upon by the Attorney General, "it was permissible to prove the declarations of the deceased to the effect that he was going to the home of the defendant, Lillie D. Lynch, to visit her."

In addition to the authorities cited in *Spivey and Lynch* v. *State, supra,* see *State* v. *Pearce,* 87 Kan. 457, 124 P. 814, 30 Ann. Cas. 1913E, p. 358, and numerous cases cited in note; *Kilgore* v. *Stanley,* 90 Ala. 523, 8 So. 130; and *Harris* v. *State,* 96 Ala. 24, 11 So. 255.

In *Harris* v. *State, supra,* it is held, quoting from syllabus: "In a trial for homicide, declarations of the deceased, made just before he started to the place where he was killed, of his object in going there, are admissible as part of the *res gestae.*"

3. The court did not err in permitting the prosecuting attorney to ask the appellant, on cross-examination, the following question: "How many different men have you shot at?" nor in permitting the appellant to answer the question.

In the recent case of *Stanley* v. *State, ante,* p. 536, the appellant was asked, on cross-examination, the following questions: "How many men did you shoot before that? Tell the jury how many men you shot before that." Answer: "I have shot two men before this." In that case the majority of the court said: "These questions were asked for the purpose of affecting the credibility of appellant, upon the theory that his testimony might be discredited or impeached by specific acts committed by him in the past which may have been crimes, but not necessarily so. This court has adopted the rule that witnesses, including the accused, may be impeached on cross-examination by drawing out the fact that they have committed other crimes and immoralities of various kinds. *Hollingsworth* v. *State,* 53 Ark. 387, 14 S. W. 41; *Shinn* v.

*State,* 150 Ark. 215, 234 S. W. 636; *Bullen* v. *State,* 156 Ark. 148, 245 S. W. 493; *Lytle* v. *State,* 163 Ark. 129, 259 S. W. 394. Although committed to this liberal rule for impeaching witnesses, including the accused, this court has said that the rule has its limitations, one being that the witness cannot be asked about a mere accusation or an indictment preferred against him for the purpose of attacking his credibility, because a mere accusation or indictment raises no legal presumption of guilt. *Jordan* v. *State,* 165 Ark. 502, 265 S. W. 71. We think the same reason should apply to questions touching specific acts of a witness which are not necessarily crimes. A homicide is not necessarily a crime. The killing may have been an accident or entirely justifiable. The court erred in requiring appellant to answer the questions propounded by the prosecuting attorney relative to shooting other men prior to shooting the deceased.''

In so holding we inadvertently, and without express mention, overruled the case of *Turner* v. *State,* 128 Ark. 565-568, where, upon a precisely similar question, we said: ''The next assignment of error is that the court erred in permitting the State to prove by defendant, on his cross-examination, that he had once killed another man in that county. The defendant objected to that testimony, but the court admitted it, with the privilege to the defendant of stating circumstances under which the former killing occurred, which he did, showing that he was justified and that he had been acquitted. We think the testimony was competent as affecting the credibility of the witness in his own behalf.''

Now, in the case of *Stanley* v. *State,* above, our attention was not drawn to the case of *Turner* v. *State, supra.* It was not our purpose, in the case of *Stanley* v. *State, supra,* to overrule, either expressly or by implication, the case of *Turner* v. *State, supra.* It is manifest that the two cases are in irreconcilable conflict. If we adhere to the holding in *Stanley* v. *State, supra,* then we necessarily, by implication, overrule the case of *Turner* v. *State, supra.* We therefore return to the doctrine

announced in *Turner* v. *State, supra,* and expressly over-rule the doctrine anounced in *Stanley* v. *State, supra.*

In the case at bar the appellant, after stating, in answer to the questions asked him on cross-examination, that he had shot at three different men, was permitted to give full explanation of the shots he had fired, and in doing so he fully exonerated himself.

The majority of the court, in the case of *Stanley* v. *State,* above, was of the opinion that it was improper to permit the defendant, on cross-examination, and for the purpose of testing his credibility, to be asked any questions the answer to which might not involve any moral turpitude on the part of the witness. But we are now convinced, upon a more careful consideration, that it is proper to ask the appellant, on cross-examination, for the purpose of testing his credibility, any questions the answer to which may, or may not, connote a lack of moral character, and to allow the witness to answer such questions.

This holding we now believe to be in accord with *Turner* v. *State, supra,* and many previous decisions of this court, which we have today collated in the case of *Whittaker* v. *State, ante,* p. 7.62, just handed down. See the cases were cited.

It follows, as already stated, that the court did not err in permitting the prosecuting attorney to ask, and the appellant to answer; the questions above set forth.

4. The court did not err in giving instruction No. 6, nor in refusing to modify the same as requested by the appellant. The instruction, without the modification, in legal effect was the same as it would have been if modified and given as requested by the appellant. The instruction as given was substantially in the language of the statute, and in conformity with the many previous decisions of this court.

As to whether or not the defendant has acted as a reasonable man, and without fault or carelessness on his part, under the statute, must be determined by the jury from the facts and circumstances in the case, from the

viewpoint of the defendant, or as they might have appeared to the defendant. *Smith* v. *State,* 59 Ark. 132, 26 S. W. 712; *Magness* v. *State,* 67 Ark. 594, 50 S. W. 554, 59 S. W. 529. The instruction, as we interpret it, was in accord with this view.

Instruction No. 11 given by the court was a correct interpretation of the law, and applicable to the facts which the testimony for the State tended to prove.

It was not error to refuse appellant's prayer for instruction No. 14, for the reason that the subject-matter of that instruction was fully and correctly covered by other instructions given by the court.

Since there is no reversible error in the rulings of the court, the judgment is affirmed.