## McALISTER v. STATE.

### Opinion delivered July 10, 1911.

1. WITNESS—CROSS EXAMINATION.—A witness in a murder case may be asked on cross examination whether he had not admitted to another that he had assassinated a negro man, as affecting his credibility. (Page 615.)

2. SAME—IMPEACHMENT AS TO COLLATERAL MATTER.—While it is proper to permit a witness to be asked as to specific acts affecting his credibility, yet if such matters are collateral to the issue, he can not, as to his answer, be subsequently contradicted by the party putting the question. (Page 616.)

3. Appeal and Error—Prejudicial Error.—Where the State, to impeach a witness for the defense, asked him concerning a collateral matter, and was then permitted to contradict his answer, this constituted prejudicial error. (Page 617.)

Appeal from St. Francis Circuit Court; *Hance N. Hutton,* Judge; reversed.

STATEMENT BY THE COURT.

Appellant was indicted and convicted of the crime of murder in the first degree. The indictment in proper form charged him with the murder of B. F. Kirby. Kirby was assassinated about sundown on the evening of Friday, August 19, 1910, by some one lying in ambush. He was shot in the back with a load of buckshot while returning to his home from the town of Marianna, in Lee County, Arkansas. He was on what is called the Skidmore road, and was at the northwest corner of the fence around what is called the Westwood plantation, at a distance of about nine miles from the town of Marianna. Kirby had been a candidate for sheriff of Lee County in the primary held in March, 1910, and during that time appellant was an active and ardent supporter of his opponent. On account of some statement or remarks which Kirby understood McAlister had made concerning him during the campaign, Kirby about the month of May, 1910, met McAlister in a restaurant in Marianna and cursed and abused him severely. Subsequent to that time McAlister stated to a witness named Taynter, in substance, that he did not want him to have anything to do with Kirby, and that on account of his friendship for Kirby he (Taynter) would have to move off the Soudan plantation of which McAlister was manager. McAlister said "that Kirby wants Soudan, and he is not going to get it," and that "there was going to be a killing, and that he was not going to be the one killed." Some time during the same summer McAlister, in a conversation in the presence of one T. C. Conner, a witness, stated that he and Kirby were not on good terms, and that if Kirby didn't let his business alone there would be some hereafter about it. McAlister's language in this conversation was very vile. About two weeks before the killing he told W. M. Hill, a witness, that he had heard that Kirby or some of his friends were saying that he (McAlister) was going to be fired from Soudan, and further said that it was true that Mr. Kirby

gave him a cursing, but that he was not afraid of him or anybody else, and that if anybody was killed it would not be McAlister. On the morning of the 19th of August, 1910, Kirby was in Marianna. A witness named Gillenwater met McAlister and Al Sullivan (who is jointly indicted with appellant) at the corner of Shaul's store in Marianna, and at that time Kirby was standing across the street some two or three doors below the opposite corner. Kirby was in his shirt sleeves, and went north to Schlichtl's hardware store, and in a moment reappeared upon the street with his coat on walking towards the direction of McAlister, Gillenwater and Sullivan. Before Kirby reached them, McAlister said to Sullivan: "I have to go by the courthouse. Will you go with me?" And Sullivan answering in the affirmative, they walked across the block to the steps that go up into the courthouse yard, but didn't go in the courthouse, but turned and went down to Friar's livery stable, and in a few moments got in a surrey and drove out of town in the direction of the Soudan plantation. They arrived at the Soudan plantation about 11 o'clock, and McAlister called to the house to have his dinner prepared at once, and called to his hostler to saddle his and Mr. Sullivan's horses. About 12 o'clock or shortly after, they rode on down towards the Westwood plantation, each armed with a shotgun. They arrived at Handy Price's house near the southwest corner of Westwood field about 1 o'clock accompanied by Bob Williams, who had no gun, but was armed with a pistol. They rode in the field gate near Price's house, got some water and continued on through the field for about 150 yards, after which no witnesses saw them until after the assassination. Kirby left Marianna about 5 o'clock in the afternoon, and passed the house of John Giles, a witness, which was about a mile from the corner of the field, about sundown. About 10 minutes after Kirby passed, a gunshot was heard by Mr. Giles and also by witnesses, Handy Price and his wife. The gun shot was at the corner of the Westwood field. When the shot was fired, Price and his wife heard a horse running a little distance, and then it stopped, and in a moment came on and passed in front of their house. It was Kirby's mare, riderless. About 10 minutes after the shot McAlister and Sullivan rode out through the field gate which they had entered, riding at a very rapid gait, and went through the woods road towards the

Soudan plantation. They both had shotguns. Kirby lived on the St. Francis River at the northeast corner of the Westwood field about one mile from the point of killing. Mrs. Kirby was at home when Kirby's mare came trotting up to the gate about dusk. She put a negro named Nesbitt on the mare, and started him back in the direction the mare had come, she herself following on foot. They found Kirby lying on his face·in the road about 100 yards from the corner of the Westwood field. She called for Handy Price, who lived nearby, and called for Mr. Lindsey and Mr. Giles. They put the body of Kirby in a wagon and carried it home. Then Mr. Giles went to Marianna to inform the public. He arrived at Marianna about 11 o'clock. Kirby's friends 'phoned to Forrest City immediately, and had some bloodhounds started to Marianna. They arrived the next morning about daylight. The bloodhounds were taken by their owner, accompanied by the sheriff and deputies and a deputy constable, to the scene of the killing. They arrived on the ground between 7 and 8 o'clock in the morning. The officers were under the impression that Kirby had been shot in the left temple, so they went to the spot where the body was found and put the dogs on the north side of the road, the direction from which they supposed the shot was fired. The dogs proceeded to search, but found no trail until finally they walked down to a large oak tree which stands on the south side of the road about 30 steps from the corner of the Westwood field. Here they struck a trail, and followed it to a large log which lay about 30 feet south from the corner of the Westwood field and against a wire fence. When they reached this log, they began to bark and pull on the lines. Behind this log was evidence of where some person or persons had remained for some time; the weeds and grass were trampled down and withered. The dogs continued south along the wire fence for about 30 yards, when they passed through the wire fence into the woods. All the west side of the Westwood place is thick woods with cane and underbrush for a distance of a hundred yards or more from the fence out east to where the quarter line begins. When the dogs passed through the wire fence, they ran to a place where a horse had been hitched. The grass and weeds were pawed entirely off the ground, and the cane as far as a horse could reach was all eaten and bitten down,

indicating that a horse had been there for a considerable time. At this place the chain by which the dogs were leading their owner caught in a horseshoe which had been recently shed. It was the left hind shoe. Four nails on the inside of the hoof had been pulled through, one of the nails on the outside was entirely missing from the shoe, one had been pulled through the hoof, and one indicated that it had been freshly broken off. They took the shoe, and it was afterwards delivered to a justice of the peace. Near where the shoe was found was evidence of where two other horses had been hitched for some time, and against the wire fence and parallel with it was a beaten path, about 18 inches wide and 10 feet long, where apparently some one had walked up and down until all the weeds and grass had been crushed and had died and withered. The dogs continued to follow the trail, barking and smelling of the cane on out to the cotton patch. They were following all the time horse tracks. One of the horses was unshod and had large feet. One of the horses had three shoes on, and the left hind shoe was missing. One of the horses was apparently shod all around. When they reached the cotton patch, the largest track and the one with the three shoes on it went straight across the cotton patch to a negro house on the road that leads down from the big gate at witness Handy Price's through the field, being the same road from which the defendants were seen last before the killing. The track that was shod all around turned to the right when it reached the cotton field, skirted around the edge of the timber and across the road some two or three yards around and continuing to skirt a little belt of timber went out towards where some new ground was being cleared in the Westwood field. The dogs followed the two tracks, and when they arrived nearly at the cotton pen the tracks turned north towards the gate diagonally across the road. This was between 9 and 10 o'clock in the morning, and a very warm, dry day. When the dogs reached the road, they refused to follow the trail any further. There had been considerable travel up and down the road that morning. The dogs were not taken out at the gate and put on the road going through the woods north for some reason, but were carried back to town. When the officers had followed the dogs down the fence by the place where the horses were hitched and out to the big gate, they first learned that Mr. Kirby

was shot in the right shoulder and back. At the place where an old log lies and a big oak tree stands, the roads turned abruptly to the left, so that a person riding along the road going towards Mr. Kirby's house, as he was going, would have his back directly toward that tree and logs. For a distance of a mile from the big gate out of which McAlister and Sullivan passed, as has been stated, about 10 minutes after the shooting, it is woods, and then the road strikes the Soudan place, and runs through it for about three miles, passing some fifteen tenant houses. Many of the people living in these houses testified to the fact of McAlister and Sullivan riding by about dark and after dark that night, and to the fact that they were riding very rapidly. No witness testified to seeing them going by before sundown. A witness by the name of Jackson, who was McAlister's hostler, testified that when Mc-Alister and Sullivan arrived at home that night after dark Mc-Alister said to the witness: " 'In case anybody asks you what time I came, you say 6 o'clock.' And I said: 'All right.' He walked off a little piece, and said: 'Do you understand what I say?' and I said: 'Yes, sir,' and he said: 'I mean 6 o'clock, nigger.'" The testimony of Jackson was corroborated by a white lady who was sitting on her porch a short distance away. On Saturday morning about 8 o'clock Bob. Williams rode up to the Soudan place, and when he got there he and McAlister walked out to the old blacksmith's, C. C. Johnson's, and McAlister told Johnson to take the shoes off his mare, and also off Williams's horse. Sullivan, the evening before, was riding the roan mare of McAlister, while McAlister was riding the large bay mare, and Williams was riding his horse, the one from which the shoes were removed Saturday morning. Johnson, the blacksmith, laid the shoes aside, and a few hours afterwards, when he heard of the assassination, he locked them up. The roan mare had three shoes on, the one on the left hind foot being missing. Williams's horse also had three shoes on, the right front shoe being missing. On Sunday morning McAlister and Sullivan rode the large bay mare and the roan mare to town, and they were put in a livery stable. The blacksmith took the shoe that was found in the Westwood woods and tried it upon the right hind foot of the McAlister mare and it fitted in the mare's hoof, corresponding to the broken piece of nail in the second nail hole. On the out-

side of the hoof was found the remaining part of the nail, which exactly fitted the part that was in the shoe. Afterwards the other shoes that Mr. Johnson had taken off were fitted upon the mare and also upon Williams's horse, and the blacksmith identified the four shoes as belonging to the same set. The testimony shows that Bob Williams left the scene of the killing about 30 minutes before the shot was fired. He was seen by hands who had been working in the new ground, and had quit, and were on their way home, as he came riding his horse around the edge of the thicket. He rode up to a turnrow which runs around the north side of the place, and followed that turnrow out at the gate of a negro named Grant Williams, directly in front of Mrs. Kirby's house. Mrs. Kirby observed him as he rode along this turnrow and out at the gate. She testified that it was about 50 or 60 minutes before the mare came up to her gate. This way Williams was going to get home was a longer distance than Williams would have had to have taken had he gone the most direct route from the scene of the killing to his house. It was just after sundown when Mrs. Kirby saw him pass. He overtook the hands that had quit work in the new ground on the road to his house after he had passed through the gate at Grant Williams's. Bob Williams was the nearest white neighbor to Mrs. Kirby, living about a quarter of a mile from her, and was the only white neighbor who lived within a mile and a half. She sent him word to come up to her house that night after the killing, but he did not go. After Handy Price had helped to carry the body of Kirby down to the house, and had gone back home, he got on his mule and rode over to Mr. Bob Williams's house, and called him out, and told him about the killing. He testified that Williams did not ask a question about the manner in which Mr. Kirby was killed nor about any of the details, but told him (Price) to go home and keep his mouth shut and to tell his folks to do the same thing. In the afternoon about 1 o'clock on the day of the killing, when the defendant, Sullivan and Williams went in the gate at Handy Price's place, a negro named Will Cartwright, who had been working in the deadening and was going home to dinner, walked down the road leading toward the field and just in front of Sullivan and Williams. He testified that as he was walking down the road he looked back and saw them coming. They were about

150 yards south of the gate. He walked on a little further, and looked back again, and they had disappeared. He lived on down the road which he was traveling, which road leads through the Westwood field from north to south. His house sets off of the road some 50 yards and about the same distance from a turning road that runs east to Mr. Bob Williams's residence. They were not seen any more during the afternoon, nor until they rode out at the gate after the assassination.

The above is the statement of the facts by the Attorney General as they were developed on the part of the State.

On behalf of the appellant, Bob Williams testified that the chief manager of the plantation had directed him and McAlister to look over the woodland on the west side of the Westwood field with the view to clearing about forty acres; that when they rode through the gate about 1 o'clock they continued on south through the Westwood field about a mile and a quarter, passing directly in front of Will Cartwright's house, and went out at the gate on the south side of the field, which was about twenty yards from a house in which a negro named Philips and his family lived. About a quarter of a mile after they had gone out of the field they got down and hitched their horses, and Sullivan, who was with them, went hunting, and he (Williams) and McAlister proceeded to sketch out a line through the woods and out to the river to where an old mill used to be situated, and at which was an old house, and that after they finished sketching the same they came back to where their horses were hitched, and Sullivan came back from hunting also, and all three of them got on their horses and rode back up the road and through the field until they got to within about two hundred yards of the big gate at Handy Price's, where they turned to the left and went in the woods where their horses were hitched; that they got down and hitched their horses, and all three of them got on the outside (west side) of the fence, and went south about 250 yards, and all three of them worked their way back east through the cane and brush, hacking a small trail through the cane and brush out to the road they had just come up, near a house occupied by John James, a negro and his family. He saw nothing of the negroes. They then went back to where their horses were, and rode out back through the woods to the field, and he turned southeast, while

McAlister and Sullivan went up the cotton row to the little cotton house. He rode on around the edge of the field up the new ground where the negroes had been at work. The road that runs down through the Westwood field is used by the public. The road from the gate on the south side of the field, leading south-west, and upon which they hitched their horses, is also a public road. During the trip down through the field, and while they were on the public road, and on the trip back through the field, they saw no person except Will Cartwright. They passed him on their way down. When they hitched their horses in the woods near the point where Mr. Kirby was shot, none of them remained with the horses, none of them walked down the fence, and if there was any place there, indicating a person had done so, he knew nothing about it. Their horses only remained hitched there about an hour and a half. None of them went up to the corner of the fence from which Mr. Kirby was shot. When he left, it was about 6 o'clock. He separated from McAlister and Sullivan about 6 o'clock, near about sundown, and went straight on to where the negroes were cutting in the new ground. The negroes had quit work in the new ground. They generally worked until about sundown. It was about a half-mile from where the horses were hitched over to Grant Williams's house. The reason he (Bob Williams) did not go up to Mrs. Kirby's the night of the killing was because Handy Price told him that several persons were there, and another reason was, his wife was sick and didn't want him to go.

Appellant himself testified substantially the same as Williams as to the laying out of the land for clearing. He says: "Got through about 4:30. Then went back through the gate and around by the turnrow up to within a quarter of a mile of the north fence. Looked at some new land, and turned west and hitched our horses, and left them, and went to the fence about three or four hundred yards, and there was an awful thicket behind there. Got back inside the fence, and cut a line as straight as we could. Got back to the house about 6 o'clock. Sullivan was with us. Got on our horses and went home. Hitched our horses inside of the field in the timber. All went home together." Bob Williams only went a little piece with the witness, and left him, going towards the clearing. Sullivan and he went on home. Went out same gate by Handy Price's that he came in by. Saw

. Handy and his wife, went on north, and took the big road straight
to Soudan. He was riding a bay mare, and Sullivan was riding
a roan mare; were three and one-half miles from Soudan at sun-
down, riding in a fox trot; got to Soudan some time between
sundown and dark, about 7 o'clock; went to the store. Mr. Ely,
Mr. Lacy, Dr. Appleby, and Mr. Hyde were there. He got in-
formation of Mr. Kirby's death next morning about 10 o'clock
from Bob Williams. He had nothing to do with the killing of
Kirby. He denied that he told Taynter that there would be some
one killed, and that he (witness) would not be the man killed;
denied that he told Will Jackson to tell anybody that asked him
that the witness got in at 6 o'clock; says he did not hear any gun-
shot, but rode out of the field, and that he left no one on guard
with the horses. Several witnesses, on behalf of appellant, testi-
fied that appellant and Sullivan got back home on the evening
that Kirby was killed before dark. One says: "They got home
before dark." Another says: "It was between sundown and
dark." Another says: "McAlister and Sullivan came in about 7
o'clock. It was dusk dark." Another says: "We had supper
that evening about six or a quarter to six and about ten minutes
afterwards we started a game of cards, and had been playing
thirty or forty minutes when McAlister came in."

On cross examination of the witness, Robert Williams, he
was asked, in substance, by the counsel for the State, over ob-
jection of appellant, "if he (witness) had not stated to Dr. Wall
that he (witness) and the defendant, McAlister, had assassinated
a certain negro a year or so previous to the time when Dr. Kirby
was killed." The witness denied having made any such state-
ment, and the State introduced Dr. Wall, who testified in sub-
stance, over defendant's objection and exception, that Williams
had told him that he (Williams) and McAlister had killed the
negro. The court ruled out the question and answer in so far as
McAlister's name was mentioned, but permitted counsel for the
State to ask the witness if he did not tell Dr. Wall that he (wit-
ness) and others had engaged in the assassination of a negro,
and after the witness had answered "No," permitted the State to
call Dr. Wall to contradict him. Among the assignments of error
in his motion for a new trial is the above ruling of the court in
permitting the State to ask the witness, Williams, the above ques-

tion, and, further, in permitting the State to contradict the witness by the testimony of Dr. Wall. The motion for a new trial was overruled, and this appeal has been duly prosecuted.

*R. B. Smith, M. B. Norfleet, Joe T. Robinson, Mann, Rollwage & Morrow* and *P. R. Andrews,* for appellant.

The evidence is not legally sufficient to support the verdict. The evidence against defendant being circumstantial, evidence of threats by other persons against deceased is competent evidence on behalf of defendant. 136 Ala. 39; 131 Ala. 32; 150 Cal. 328; 63 Conn. 47; 188 Ill. 609; 14 Bush 106; 130 Mass. 472; 36 Tex. 24. The court had no authority to direct the sheriff not to summon special veniremen from a certain community. Kirby's Dig., § 2348; 35 L. R. A. 556; 1 How. (Miss.) 243; 86 La. Ann. 194; 48 Mich. 482; 2 Am. R. 477; 67 Mich. 466; 71 Mich. 291; 13 Col. 515; 16 Gratt. 531; 92 Tenn. 85; 91 Tenn. 453; 12 Ark. 624. The contradiction of witness Williams by Dr. Wall was erroneous. Kirby's Dig., § 3138; 61 Atl. 65; 2 N. Y. S. 738; 53 N. Y. 164; 31 N. Y. 75; 114 N. C. 835; 23 Tex. Civ. App. 617; 44 S. W. 336; 41 Vt. 80; 91 Ark. 555. The rule is the same in both civil and criminal cases. 90 Ark. 209; 72 Ark. 409; 13 Am. R. 492; 111 Ky. 530; 34 Ark. 480; 52 Ark. 303; 58 Ark. 125; 76 Ark. 366; *Id.* 302; 93 Ark. 313; 70 N. W. 982; 51 Neb. 198. Defendant's guilt can not be proved by evidence of other crimes. 36 Atl. 247; 87 Ill. 210; 53 N. J. L. 260; 64 *Id.* 557; 91 Ark. 555; 37 Ark. 261; 39 Ark. 278; 73 Ark. 262; 68 Ark. 577. The prejudicial effect of the testimony can not be removed by the effort of the court to limit it to the credibility of the witness. 83 Ark. 268; 76 Ark. 366; 61 Ark. 137; 123 Ill. 333; 71 Ark. 418; 70 Ark. 305; 77 Ark. 461; 66 Ark. 16.

*Hal. L. Norwood,* Attorney General, and *W. H. Rector,* Assistant Attorney General, for appellee; *H. F. Roleson,* of counsel.

The affidavit of the deputy sheriff has no place in the record because it was never presented to nor refused by the judge. 57 Ark. 7; 56 Ark. 563; 57 Ark. 60; 87 Ark. 459; *Id.* 461; 72 Ark. 264; 71 Ark. 577; 129 S. W. 1199; Kirby's Dig., § 6226. There was no error in permitting the prosecution to ask witness Wil-

liams if he had not killed a negro.    53 Ark. 390; 70 Ark. 422; 51 Ark. 143; 91 Ark. 555; 93 Ark. 313; 72 Ark. 409; 76 Ark. 366.

Wood, J., (after stating the facts).    The court did not err in permitting the State to ask the witness Bob Williams if he and others, not using the defendant's name, had not been engaged in the assassination of a negro from ambush near the place where Dr. Kirby was killed.    The answer to this question, if in the affirmative, would have tended to prove that the witness was an assassin, and had associated with an assassin, and therefore was so utterly depraved as to render him wholly unworthy of belief.    Any question may be asked a witness on cross examination tending to prove that he is guilty of specific acts involving moral turpitude, for all such acts would tend to affect his credibility as a witness.    Our statute, Kirby's Digest, § 3138, prescribing that "a witness may be impeached by evidence that his general reputation for truth or immorality renders him unworthy of belief, but not by evidence of particular wrongful acts," has no application to the cross examination of a witness, but only where there is an effort to impeach a witness by evidence introduced for such purpose by the opposite party.    As was said by this court in *Hollingsworth* v. *State,* 53 Ark. 387, at page 390:

"The right to impair the evidence of a witness by cross examination must not be confounded with the right to impeach a witness by evidence introduced by the opposite party.    The former may be exercised within a more extended range than the latter."

In that case we quoted from the Supreme Court of New York in *Newcomb* v. *Griswold,* 24 N. Y. 298, as follows:

"It is well settled 'that, for the purpose of impairing the credit of a witness by evidence introduced by the opposite party, such evidence must go to his general character; that proof of specific acts of immorality is not competent.    Yet it is held that, for the purpose of discrediting his testimony, the witness may be asked upon cross examination as to specific acts."

In *Ware* v. *State,* 91 Ark. 555. it is held that "a witness may be asked as to specific acts for the purpose of discrediting his testimony."    Again in *Hollingsworth* v. *State, supra,* we said:

"It is always competent to interrogate a witness on cross examination touching his present or recent residence, occupation and association."    See also *Hughes* v. *State,* 70 Ark. 422.

"In some jurisdictions a witness' acts or conduct can not be shown on his cross examination to impeach him, and such cross examination is prohibited equally with independent proof of such acts or conduct." See cases cited in 7 Encyclopedia of Evidence, page 176, and note. "But in more jurisdictions a witness may be cross examined as to his particular acts or conduct that are relevant to the impeachment of his character for truth, although they are wholly disconnected with the cause on trial;" citing a great many cases in a note from various jurisdictions, among them *Little Rock Vehicle & Implement Co.* v. *Robinson,* 75 Ark. 548, where this court, speaking through Mr. Justice McCulloch, said:

"Great latitude is allowed in the cross examination of a witness touching his residence, occupation and habits, so as to reflect light upon his credibility, and specific acts of immorality may be thus elicited which could not be proved by other impeaching witnesses." But, while it was proper to permit the witness to be asked as to specific acts involving moral turpitude affecting his credibility as a witness, it was error to permit the State to call Dr. Wall for the purpose of contradiction. "Where a witness is cross examined as to a particular act of misconduct relevant to his character for truth but disconnected with the cause on trial, the cross examining party is bound by the answer." 7 Encyclopedia of Evidence, page 180, and cases cited.

"In order to avoid an interminable multiplicity of issues, it is a settled rule of practice that when a witness is cross examined on a matter collateral to the issues he can not, as to his answer, be subsequently contradicted by the party putting the question. The test of whether a fact inquired of in cross examination is collateral is this: Would the cross examining party be entitled to prove it as part of his case, tending to establish his plea?" *Butler* v. *State,* 34 Ark. 480; *Plunkett* v. *State,* 72 Ark. 409; *Abbott* v. *Herron,* 90 Ark. 209; *Ware* v. *State,* 91 Ark. 555; *Sellers* v. *State,* 93 Ark. 313. See also: *Billings* v. *State,* 52 Ark. 303; *Jones* v. *Malvern Lumber Co.,* 58 Ark. 125; *Hinson* v. *State,* 76 Ark. 366; *Hot Springs Street Ry. Co.* v. *Bodeman,* 76 Ark. 302.

It is clear that the State will not be allowed to prove as a part of her case that Williams took part in the assassination of a negro. That would have been a collateral issue. "A cross exam-

ining party is concluded by the answer which the witness gives to a question concerning a collateral matter, and no contradiction will be allowed, even for the purpose of impeaching the witness." 29 Am. & Eng. Enc. of Law, (1 ed.), 793, and cases cited in note.

But the State contends that the uncontroverted evidence shows that appellant is guilty of the crime charged, and that therefore the judgment should be affirmed, notwithstanding the error mentioned above. We have set out at length the statement of facts by the Attorney General in the most favorable light to the appellee; and while there was abundant evidence to sustain the verdict, there was evidence on behalf of the appellant which, if believed by the jury, would have warranted them in returning a verdict of not guilty. The theory of the State was that appellant, Sullivan and Williams were in a conspiracy to murder Kirby, and that, in pursuance of such conspiracy, they went to the place where Kirby was assassinated and lay in ambush for hours on the roadside. waiting for him to come, and finally, just before the killing, sent Williams to ascertain whether Kirby might not have returned home another way, while the other two remained on watch and killed him as he passed during Williams's temporary absence. Williams's testimony tended to rebut this theory, and was therefore very material for appellant. The improper method of impeachment allowed by the court was highly prejudicial to appellant. The theory of appellant was that he and his companions, Sullivan and Williams, left the scene of the assassination before the same took place, and that he was at another and different place when the crime was committed, and his own testimony and the testimony of Williams and others tended to establish that fact. In a case of circumstantial evidence like this it is always a question of fact for the jury, and not of law, as to whether or not the party accused is guilty of the crime with which he is charged. We can not take that question away from the jury.

We find no reversible error in the other assignments contained in the motion for a new trial, but for the error indicated the judgment must be reversed, and the cause remanded for a new trial.