## TULLIS v. STATE.

### Opinion delivered January 21, 1924.

1. HOMICIDE—DEFENSE OF INSANITY—EVIDENCE.—In a prosecution for murder, evidence *held* to sustain a conviction of murder in the second degree, as against plea of insanity.

2. WITNESSES—IMPEACHMENT.—In a prosecution for murder, in which defendant's daughter testified that the deceased had threatened to kill defendant, and, on cross-examination, denied that she had made a statement that defendant was going to kill the deceased with a certain pistol, the admission of testimony that she had made such statement was prejudicially erroneous, as the statement related to a collateral issue.

3. HOMICIDE—REFUSAL OF INSTRUCTION AS TO MANSLAUGHTER.—In a prosecution for murder a requested instruction that, although defendant believed he was in danger of losing his life or receiving great bodily injury at the hands of the deceased, still, if he was negligent in coming to such belief, he should be found guilty of manslaughter, should have been given.

Appeal from Howard Circuit Court; *B. E. Isbell,* Judge; reversed.

*James S. Steel* and *Steve Carrigan,* for appellant.

*J. S. Utley,* Attorney General, *John L. Carter, Wm. T. Hammock, Darden Moose* and *J. S. Abercrombie,* Assistants, for appellee.

HART, J. Elmer Tullis was indicted for murder in the first degree, charged to have been committed by killing Jim Norwood by shooting him with a pistol, in the town of Mineral Springs, Howard County, Ark. He was tried before a jury and convicted of murder in the second degree, his punishment being fixed at fifteen years in the State Penitentiary. To reverse the judgment of conviction against him, the defendant has duly prosecuted an appeal to this court.

According to the evidence adduced by the State, Jim Norwood came into the store of T. F. Dillard, at Mineral Springs, Howard County, Ark., on the afternoon of Saturday, the seventh day of April, 1923, and took a seat on the counter, about the middle of the store. About four o'clock in the afternoon the defendant, Elmer Tullis, came to the back door of the store, and called Jim Norwood out behind the store. In a few minutes after Norwood went out of the back door, the persons in the store heard a gun fire. Then Jim Norwood came running through the store, with Elmer Tullis running after him, about two or three feet behind him. Tullis was snapping his pistol at Norwood. Norwood was crying, "Oh, don't shoot me!" The pistol fired once while they were going through the store, and the shot went into the stairway about the middle of the store. They then ran out of the store, and another shot was fired. This shot struck an old negro who was in the street. Norwood continued running, and ran through another store, and Tullis kept close behind him, snapping his pistol at him. Norwood then fell, and died in fifteen or twenty minutes.

The town marshal heard the shots, and ran to the scene of the killing. Tullis told him that he had shot Jim Norwood. He said that Jim Norwood had got a license to marry his daughter, and that he objected to it.

He said that he demanded the license from Norwood, and, when he did that, Norwood ran his hand in his bosom, and he shot him.

Other witnesses for the State testified that Norwood was running, with his hands up, and that Tullis laughed after he had killed Norwood.

The father of Norwood said that he had had a conversation with Tullis some weeks before the killing, and that Tullis remarked to him that if ever a man tried to marry his daughter he would kill him.

Another witness testified that he had a conversation with Tullis, about three weeks before the killing, and that Tullis told him that, before he would let Jim Norwood marry his daughter, he would kill him, even though he went to the electric chair in fifteen minutes.

In the application for a license to marry Jewell Tullis, Jim Norwood gave his own age as 19 and Jewell Tullis' age as 15 years.

The defendant was a witness for himself. According to his testimony, he had lived in Howard County nearly all of his life, and was a farmer. He had a wife and six children living. Jewell Tullis was his oldest child, and was fourteen years old at the time he shot Jim Norwood. About a month before the defendant shot Norwood he found out that he was courting his daughter. Norwood had been married before, and his wife had been dead something like a year. The defendant was informed that she had died on account of neglect. He objected to Jim Norwood's courting his daughter, and told him that his little girl was too young to keep company with any one. He used all the means in his power to keep Norwood from courting his daughter. Within a week before the killing two persons had told him that Norwood had threatened to kill him if he did not let him marry his daughter. The defendant sent an order to the county clerk, directing him not to issue a marriage license to Jim Norwood and Jewell Tullis. On the day of the killing Norwood passed the house of the

defendant, in a wagon, going to Mineral Springs. The defendant got on the wagon and rode a short distance with Norwood. He told Norwood that he had heard that he was fixing to run away with his daughter and marry her the next day. Norwood denied this, and said that they had never thought about marrying. The defendant told Norwood that his little girl was too young to keep company with any one. Norwood replied that, if the defendant objected to her keeping company with him, he would stop, and never write to her again. The defendant then got off the wagon and went home. A neighbor came by later in the day and told him that Norwood had already got a license to marry his daughter. The defendant then spoke to his daughter about it, and asked her if she was going to marry Jim Norwood the next day. She said "Papa, Jim Norwood said he was going to kill you if I did not marry him, and I don't want to marry him. He pulled a gun out of his pocket and says, 'If you don't marry me I am going to kill your daddy.'" The defendant then hitched a horse to his buggy and went to Mineral Springs. He saw Jim Norwood's team back of Dillard's store, and went into the store and saw Jim Norwood sitting on the counter. He told Norwood that he wanted to talk to him, and asked him to go out back of the store. He told Norwood that he heard that he had bought a license to marry his girl. Norwood replied, "I have not got a license, but I will get you." At the same time Norwood stuck his hand in his bosom like he was going to get his gun, and the defendant said that he did not know what happened from then on. He did not know whether he followed Norwood or not. He remembered nothing more until after the whole transaction was ended, and he found himself up stairs, looking out of a window of a room.

A brother of the defendant and two other witnesses testified that, within a week before the killing, Jim Norwood had told them that he was going to have Jewell Tullis or kill Elmer Tullis. Another witness testified

.that, just after the shooting, Tullis snapped his pistol at him because he tried to stop him; that the defendant was jerking, and laughed an unnatural laugh, and appeared to be insane.

Several physicians testified as expert witnesses. It was their opinion that Elmer Tullis was suffering from paranoia and was insane at the time of the killing. He had a delusion that Norwood's first wife had died from neglect, and that his daughter would die in the same way if she married Jim Norwood.

The evidence for the State is sufficient to warrant the verdict of the jury.

The main reliance of counsel for the defendant for a reversal of the judgment is that the trial court erred in admitting the testimony of Beatrice Norwood, to contradict the testimony of Jewell Tullis on a collateral issue. It appears that Jewell Tullis was introduced by the defendant, and testified that she told Jim Norwood that she had decided not to marry him, and that he reached in his pocket and pulled out a gun, saying, "If you don't marry me I will kill Elmer Tullis, your daddy." She told her father about this threat on the day of the killing, before it occurred.

On cross-examination she was asked if she did not show Beatrice Norwood, a sister of Jim Norwood, a pistol hanging on the wall at her father's house, and tell her that it was the pistol with which her father was going to kill Jim Norwood. She denied having told this to Beatrice Norwood.

Beatrice Norwood was called by the State in rebuttal, and, over the objection of the defendant's attorneys, was allowed to testify that Jewell Tullis had told her that a gun which she saw in the house of Elmer Tullis some time before the killing was the gun that Elmer Tullis was going to kill Jim Norwood with, and that she believed that she, Jewell Tullis, would throw it in the well.

We think that this assignment of error is well taken. The general rule is that any evidence is admissible if it

tends to prove the issue or constitutes a link in the chain of proof. This rule excludes all evidence of collateral facts. The reason is that such evidence tends to draw away the minds of the jurors from the point in issue, and to excite prejudice and mislead them.

It was within the discretion of the court to allow the State to ask Jewell Tullis, on cross-examination, if she had not made the statement attributed to her to Beatrice Norwood, for the purpose of affecting her credibility as a witness. The testimony, however, was not evidence of a substantive character tending to establish the guilt of the defendant. His guilt could not be established by statements or declarations made by his daughter when he was not present. The court properly permitted the question to be asked solely for the purpose of testing the credibility of Jewell Tullis. Jewell Tullis answered that she had not made the statements attributed to her, and this should have ended the matter. The court erred in allowing the State to contradict Jewell Tullis by the testimony of Beatrice Norwood, as stated above. A party cannot examine a witness as to collateral matters and then impeach him by proof of contradictory statements. *Hinson* v. *State,* 76 Ark. 366; *Ware* v. *State,* 91 Ark. 555; *Sellers* v. *State,* 93 Ark. 313, and *McAllister* v. *State,* 99 Ark. 604.

The testimony was prejudicial because it may have aroused in the minds of the jury a suspicion or belief that Elmer Tullis had formed the design to kill Jim Norwood, and thereby caused the jury to find the defendant guilty of a higher grade of crime than it otherwise would have done. We cannot know how far the minds of the jurors were prejudiced by the admission of this testimony. Under the authorities just cited, the action of the court in admitting the testimony of Beatrice Norwood constitutes reversible error.

The next assignment of error is that the court should have given instruction No. 19 requested by appellant. The instruction reads as follows:

"You are instructed that, although you may believe that the defendant, at the time he shot deceased, believed he was in danger of losing his life or receiving great bodily injury at the hands of the deceased, still if you should believe, beyond a reasonable doubt, that the defendant was negligent, as explained in these instructions, in coming to such belief, then it would be your duty to find him guilty of manslaughter."

At the outset it may be stated that, even though the court should have given this instruction, or a similar one, at the request of the defendant, the refusal to give it would not constitute reversible error. The reason is that the jury, by its verdict, found the defendant guilty of a higher decree of homicide than manslaughter, and the error could be cured by reducing the punishment to that for manslaughter and sentencing the defendant for that crime. Inasmuch, however, as the judgment of conviction must be reversed for the error in the admission of testimony, as above stated, we call attention to the fact that, in *Brooks* v. *State,* 85 Ark. 376, it was held that it was not error to give an instruction, over the objections of the defendant, in precisely similar language. Therefore the court should have given this instruction, or one of similar import. *Bruder* v. *State,* 110 Ark. 402.

It is claimed by the State that other instructions given by the court cover this point. Without setting out the instructions, we are of the opinion, after examining them, that they do not fully and fairly submit this issue to the jury. Therefore the court should have given the instruction, or one of similar import to the jury.

For the error in admitting the testimony of Beatrice Norwood, as indicated in the opinion, the judgment will be reversed and the cause remanded for a new trial.