JAMES RAY EDERINGTON *v.* STATE OF ARKANSAS

5324                                        428 S. W. 2d 271

Opinion delivered June 3, 1968

*John F. Gibson,* for appellant.

*Joe Purcell,* Attorney General; *Don Langston,* Asst. Atty. Gen., for appellee.

CARLETON HARRIS, Chief Justice. This is one of the

most unusual murder cases to come before this court. J. H. Maroney, a resident of Bradley County, Arkansas, and familiarly known in the neighborhood as "Junior" Maroney, was slain, at home in his bed, between the hours of 1:00 A.M. and 3:00 A.M. on March 30, 1967. His death was caused by a fatal bullet wound in the left side of his head, the bullet having been fired from a small caliber weapon, apparently a .22 rifle. The rifle belonged to Maroney. After an investigation of over a month, appellant, James Ray Ederington, at that time 16 years of age, was arrested, and charged with the murder. The case proceeded to trial on July 19, 1967, and concluded on July 22, at which time the jury found Ederington guilty of the crime of murder in the second degree, and fixed his sentence at 15 years imprisonment in the State Penitentiary. On August 1, the motion for new trial was denied, and, from the judgment entered in accordance with the jury verdict, appellant brings this appeal. Several points are raised for reversal, the first being that the evidence was insufficient to justify the conviction.

The evidence reflects that Maroney, with his wife and children, lived a few miles south of Banks, Arkansas, there being a number of other families living in the general area, which was known as the Lanark community. The nearest neighbors were Mr. and Mrs. Sam Ormand, who lived about 400 yards from the Maroney home. About 3:00 A.M. on the morning of March 30, Glenda Maroney, 15-year-old daughter of Junior Maroney, rode her bicycle to the Ormand home and notified Ormand that her father had been shot. She requested that a doctor be called. Ormand hurriedly dressed, got in his truck, and drove to the Maroney house.[1] Ormand went into the home, but did not go into the back bedroom where the body of Maroney had been found. He was not armed: "Well, there wasn't any light in there, and I just didn't have the nerve to go on in

[1] Mrs. Maroney was not at home, but was in Little Rock studying for the Poverty Program. Two smaller children, a 4-year-old girl and an 8-year-old boy were in bed in separate rooms.

there.'' Ormand then left the house and drove to the home of Ed Green, who dressed and accompanied Ormand back to the Maroney residence. They ascertained that Maroney was dead. There was no sign of disturbance in the room, and the men did not see anyone around the house. The back door was open, and the back screen was not hooked. O. B. Williams and Therman Williams, brothers, who live about 2½ miles from the Maroney home, received notice of the shooting by telephone, and went to the house, where they found other neighbors, Mr. and Mrs. Callaway, Ormand and his wife, and Ed Green. After staying approximately an hour, they went to the home of Maxine Ederington, a widow with six children, who lived about a mile and a half to two miles from the Maroney house. Mrs. Ederington, who had been notified by Peggy Williams (wife of Therman Williams) via telephone about 3:15, of the shooting of Maroney, was awake, and the two men drank some coffee at her home. Mrs. Ederington left to go to the Maroney home,[2] and, as she left, according to O. B. Williams, called out to her son, ''Jimmy, get up and lock the door,'' and he answered from the bedroom, ''Well—um.'' The witness testified that he recognized the voice as that of Jimmy, appellant herein. Therman Williams was the first person to locate a .22 rifle (evidently the murder weapon), which was found lying on the ground about three or four feet from the side of Maroney's truck, the vehicle being parked facing of the front of the house. The rifle was a .22 automatic made by Sears-Roebuck.[3]

Sheriff John Cruce of Bradley County received notice of the shooting about 3:15 A.M., and, with his deputy, Harold Spraggins, proceeded to the Maroney home, arriving there about 3:40 A.M. A number of neighbors from the vicinity were present. During his investigation of the premises, the sheriff saw a box of

[2] Mrs. Ederington did not accompany the Williams brothers, but drove on ahead of them.

[3] No one was ever able to testify whether the rifle had been placed on the ground by the truck, or had been dropped.

.22 shells on the outer edge of the dash of the truck, which was taken and subsequently examined for finger prints. The rifle, which was covered with dew, was examined for finger prints, but none were obtained because of the oily surface of the weapon. Blood was on the bed where Maroney was found, and there was a small hole back of his left ear, caused by the entry of the bullet. No other wounds were found. After the body was removed, the sheriff observed a .22 hull on the bed, which had apparently been under Maroney, and he took this as evidence. On the 31st, Deputy Spraggins went to the home of the Ederingtons, but appellant was in school; his mother took him to the sheriff's office later, and Spraggins took his finger prints. The cartridge box and finger prints were sent to the F.B.I. laboratories in Washington.

Glenda Maroney, daughter of the deceased, and in the tenth grade at school, testified that she knew appellant well, and rode the same school bus with him each day to school. The families had visited back and forth many times. She testified that Jimmy came by her house on the 29th of March (when school was out for Easter holidays) to show her a fish he had caught in the Maroney pond, and he subsequently came back around noon, being brought to the Maroney home in an automobile by another boy, Barney Ross. Glenda was making icing to go on a cake, and asked Jimmy to stir it while she went to the store. Her little sister and brother were there at the time, and when she returned from the store, Jimmy had left, Ross having returned and picked him up. During this time, Junior Maroney was over in the field putting out soda. Glenda stated that she retired for bed on the night of the 29th around 10:00 o'clock, sleeping in the front bedroom with her little sister, Cathy. Her young brother slept in the middle bedroom, and her father slept in the back bedroom. This was where Junior Maroney customarily slept, together with his wife. Glenda said that she was awakened around 1:00 A.M. by the honking of a horn, and she called her father,

and told him that someone was out front, obtained his house shoes for him, and he went outside.[4] She heard the callers discussing the fact that they wanted gasoline, and she then went on back to sleep.[5] The witness continued:

"I woke up around 3:00 o'clock and I saw this figure standing at the foot of my bed and I called my daddy. I called him about twice and he just didn't answer and I got scared. He walked on back through the house and I got up and turned the light on and I saw these glasses laying on the dresser in my room and I knew that no one in our house wore glasses. I knew someone was in there and I went in and turned the light on in my little brother's room. I stood there beside the door and there was blood all over my daddy's pillow and I called his name and I heard this rattling noise in the kitchen and I called and he didn't answer me and so I ran out on the front porch and * * *

"I hollered for Mrs. Ormand two or three times and then I ran out and hopped on my bicycle and ran up there. I was screaming all the way up there and I told them that something had happened to daddy and I told them that I thought he had been shot and I told them to get his gun, get his gun, and I told him to be sure and get those glasses. I hadn't thought about picking the glasses up until I got up there to Mr. Sam's."

When asked if she could identify the person standing at the foot of her bed, she replied that it was "James Ray Ederington." This identification was first

---

[4] Subsequent investigation revealed that a minister, Melvin Early, who had been attending a revival meeting at Hamburg, accompanied by Ovelett Gannaway, stopped to buy the gasoline. Early testified that in pulling up to the Maroney house, he parked his car close to Maroney's truck, and noticed the .22 rifle, heretofore mentioned, in the truck. Ovelett Gannaway, who had known Maroney all of his life, and had suggested stopping at Maroney's place for gasoline, testified that it was three minutes until 1:00 o'clock when they stopped at his house.

[5] There is no testimony that anyone heard a shot fired.

given to the sheriff on the night following the day of her father's funeral, which was held on March 31:

"I told him it was Jimmy. I told him about Jimmy's actions and Jimmy's motions. That was what made me think it was Jimmy—what made me know it was Jimmy.

"His manner and I saw those glasses and I knew they were his glasses when I turned the light on. When I saw him, doing like that (Witness motions with her head) I knew it was him. Nobody I know does that.

"And the way he walked. He drags his feet when he walks."

She added:

"I saw him. I just saw him and know."

When interrogated as to why she did not immediately tell who was in the room, she replied that she was afraid to do so, and she said that the sheriff told her that it would be better if she "didn't go around" telling that she knew who it was, and he had said that her life was in danger. Admittedly, she had told some persons that she did not know who it was. From the testimony:

"Q. What did you tell the people in the community there? A. I told people I didn't know who it was, except people who needed to know. Q. What did you tell them? A. I told them that it was Jimmy. Q. What did you tell the people in the community there about who you thought it was? A. I told them that when I realized it wasn't my daddy, he done like this (Witness indicates a motion of the head), and I've seen him do that a thousand times. Q. Is that what you told the people in the community? A. Yes, sir, the ones I thought should know. Q. The ones you thought shouldn't know, what did you tell them? A. I didn't tell them anything. I told them that I didn't know who it was, it could have been a Negro or white person. I told them I didn't know

anything. Q. Do you know who you told that to? A. Just about everybody, except Mr. Ormand, my mother, Margaret Williams, the law officials.''

After Ederington was arrested, he was placed in a cell with a prisoner named Herbert Chambers. Another prisoner, Albert Walker, was also with them a part of the time. Chambers testified that he was told by the sheriff that Ederington might say something about the crime with which he was charged, and the sheriff directed Chambers to give him (the sheriff) any information that might be acquired. The witness stated that Ederington first said that he did not kill Maroney, later said that he did kill him, and then subsequently, again denied committing the crime.

John F. Walters of Washington, D. C., a finger print examiner with the Federal Bureau of Investigation, with nearly 20 years' experience, testified that there was one latent print of value on the .22 cartridge box which had been found in the truck (a thumb print), and he said that this print, and the thumb print which had been taken when Ederington was fingerprinted, were made by the same individual.[6]

Harold Spraggins (the deputy sheriff) testified that the rifle was loaded with 12 cartridges when he took it back to the sheriff's office; that it would hold a total of 16 cartridges. He explained tests that had been made, and stated that the hull of the cartridge, which had been found on Maroney's bed was fired from the rifle found by the side of the truck. The witness also said that he found nothing disturbed in the death room; that Maroney's wallet was in his pants pocket, the pants lying on the table beside the bed; he found $97.00 in the wallet; he was unable to detect any sign that anyone had tried to break into the house.

---

[6]Ederington, when later placed on the witness stand, testified that he had been fishing the day before the murder in the Maroney's fish pond, and had asked to borrow a particular bait from Maroney; that he was told that the bait was probably in the truck, and in looking for the bait, he picked up the cartridge box.

G. O. Runnels, a doctor employed by the State Hospital, testified that Ederington had been examined by the staff, and that appellant had been found to be "without psychosis."

Appellant testified that he was a good friend of Junior Maroney, and that he had gone fishing, hunting, and on other outings with the deceased. He said that Maroney treated him kindly, had never fussed at him, and he had never had any trouble at all with Maroney.[7] The witness said that he fished at Maroney's pond on March 29, went to the house and helped Glenda with icing the cake, and he stated that he went to bed at his home about 10:00 P.M. Appellant was awakened by the telephone ringing, at which time his mother was advised that Maroney had been shot; he was in the house when Williams arrived, and answered her when his mother left to go to the Maroney's and told him to lock the doors. He denied ever stating to Chambers that he had killed Maroney.

Captain L. E. Gwyn, a veteran of 20 years' service with the Arkansas State Police, testified that he conducted two polygraph examinations of Ederington, who had agreed to take the test. When asked if he knew anything concerning the death of Maroney, or if he was at the house when Maroney was shot, appellant answered, "No." Mrs. Ederington was also examined, and was asked if she knew who has shot Maroney; she answered: "No." Gwyn testified that the chart revealed that the answer from Mrs. Ederington was very clearly the truth, but he was unable to interpret the chart made on Ederington himself, because he (Gwyn) "was never able to get him [appellant] in the proper frame of mind." The officer said Ederington did not refuse to answer any of the questions, nor did he hesitate in giving answers, but the tests were inconclusive. He could not say

---

[7]During cross-examination of this witness, he stated that there is a trail that leads from his house to the Maroney house through the woods, but he did not know if it was any shorter than the regular route. "I go that way a good bit."

that appellant was telling the truth, nor could he say that appellant was not telling the truth.

Both Mrs. Ederington and her eldest daughter, Linda, testified that Glenda had told them that she had no idea of the identification of the person that she saw in the room, and appellant's sister said that Glenda remarked, "Linda, I don't know if it was black or white." Cathy Ederington, a younger sister, testified that her brother was at home when she went to bed about 9:30, and that he got up from bed when the telephone call came in the early hours of the morning.

Summarizing the evidence from the standpoint of the state, Ederington was identified by Glenda Maroney as the intruder in the Maroney home on the night of the murder, and very close to the time that the killing took place.[8] She also testified that Ederington's glasses were lying on the dresser.[9] The .22 caliber rifle was identified as the murder weapon, and the box of shells contained appellant's right thumb print. Herbert Chambers testified that Ederington said that he had killed Maroney, though before making the statement, and after making it, he also denied any implication in the murder. This evidence, if believed by the jury, was sufficient to sustain the conviction. It is true that no motive was shown, but we have held several times that it is not necessary for the state to prove a motive in order to properly obtain a conviction for homicide. *Prewitt* v. *State,* 150 Ark. 279, and cases cited therein.

This question of motive brings us to another asserted error. During the Prosecuting Attorney's cross-examination of appellant, Ederington was asked:

---

[8]Coroner Frazier testified that, in his opinion, Maroney died about 2:30 A.M.

[9]Although several persons looked for the glasses, they were never found. It is not clear whether it was thought that the intruder had returned and taken the glasses when Glenda ran from the house. Ederington was not interrogated along this line, *i. e.,* he was not asked if he still had the same glasses he was wearing on March 29th, etc.

"Jimmy, at the time you got out of the car late in the evening on March 29, did you or did you not make a remark to Barney that you would like to have sexual relations with Glenda?"

Appellant replied, "No, sir."

After the defense had closed its case, the state placed Barney Ross on the stand, and asked that he recall the events of March 29, late in the evening, when he and Ederington had returned from Monticello. The record then discloses the following:

"MR. WYNNE:

Q. At the time you dropped Jimmy off at around 6:00 or 6:30, near the Maroney home, did Jimmy make any comment to you that referred to his desire to have sexual relations with Glenda?

A. Yes, sir.

MR. GIBSON: I object.

COURT: Ask what he might have said.

MR. WYNNE:

Q. What did Jimmy say to you?

A. Well—(Witness hesitates)

(Discussion at the Bench, off the record)

THEREUPON,

MR. GIBSON: Show my objections and exceptions.

MR. WYNNE:

Q. Did the Defendant state to you words to the effect

that he'd like to have sexual intercourse with Glenda?

A. Yes, sir.

MR. GIBSON: Note my objections and exceptions.''

Appellant argues that this was prejudicial and reversible error, but we do not agree. The record does not reflect that this alleged error was brought forth in the motion for new trial, but even so, we would find no merit in the contention. Let it be remembered that this alleged statement was made late in the afternoon, approximately eight hours before the death of Maroney, and we think the evidence goes to the question of why appellant was allegedly in the Maroney home, and in Glenda's bedroom. For that reason, we think it was admissible. In *Sullivan* v. *State*, 171 Ark. 768, 286 S. W. 939, quoting 13 R. C. L., 910, § 214, this court said:

''* * * 'Where the purpose of evidence is to disclose a motive for the killing, the courts are very liberal in permitting its introduction, and anything and everything that might have influenced the prisoner to commit the act may, as a rule, be shown.' Many cases are cited in the note to sustain the text.

''See also 30 C. J. 179, § 406, and *Stokes* v. *State*, 71 Ark. 113, and at p. 117, 71 S. W. 248, where we quoted from Mr. Wills on Circumstantial Evidence as follows: 'It is indispensable, in the investigation of imputed guilt, to look at all the surrounding circumstances which connect the actor with other persons and things, and may have operated as motives and influenced his actions.' ''

Likewise, during the cross-examination of appellant, the Prosecuting Attorney asked:

''Q. Jimmy, have you ever made the statement that you were going to bash Sam Ormand's brains in when you got out of jail?

MR. GIBSON: I object. It's not related to the crime which is charged against the Defendant and is not material and is prejudicial.

(Thereupon, at the Bench, in undertones, for the record, the following proceedings were had:)

MR. WYNNE: Sam Ormand was the first person to go to the house and discovered the body. This Defendant has been heard to make the statement that he was going to bash this man's brains in if he got out of jail. It is certainly material. Sam Ormand is a material witness.

He denied it and that's his privilege.

MR. GIBSON: That's something that happened after the man was arrested and certainly could not add to the jury's competent evidence. It does not relate to the crime and is prejudicial.

COURT: Objection overruled.

MR. GIBSON: Note our exceptions."

Appellant answered the question, "No." After the defense had rested, the state placed Deputy Spraggins back on the witness stand, and asked the following question, "Now, Mr. Spraggins, in your dealings with this Defendant, have you heard him make the remark that he'd like to bash in the brains of Sam Ormand?" The witness answered that he had heard appellant make the remark two or more, possibly three times. The question was objected to before it was answered, and exceptions were noted to the court's action in overruling the objection. The state contends that this evidence was admissible as a matter of showing appellant's knowledge, intent, or design. From the brief:

"* * * When the appellant denied making the statement then the State had the right to call a witness in

rebuttal to impeach him with prior statements. It was purely testimony concerning acts of a similar nature at about the same time tending to show intent, motive and design which is clearly admissible."

We do not agree that this testimony was competent. This was entirely a collateral matter, having absolutely nothing to do with the crime with which Ederington was charged. The alleged statement was made some time subsequent to the murder, and apparently while appellant was in jail. It was not an act of a similar nature— it did not happen at about the same time as the killing —and we are unable to see how a statement referring to Ormand throws any light upon the intent or motive for the murder of Maroney. In fact, the only thing the evidence could possibly show was that Ederington was a vicious and violent person—which might have been what the state was endeavoring to show—but it is clearly inadmissible. This testimony would not even have been proper as a matter of impeaching appellant's credibility, although the question asked appellant on cross-examination was permissible, as a matter of testing credibility. However, when Ederington answered, "No," that should have concluded that particular matter. *Wright* v. *State,* 243 Ark. 221, 419 S. W. 2d 320.

The court limited neither the question asked, nor the rebuttal testimony of Spraggins, to the matter of credibility. However, we emphasize that this rebuttal evidence offered by Spraggins was inadmissible on all grounds. In *Tullis* v. *State,* 162 Ark. 116, 257 S. W. 380, we said:

"* * * The court properly permitted the question to be asked solely for the purpose of testing the credibility of Jewell Tullis. Jewell Tullis answered that she had not made the statements attributed to her, and this should have ended the matter. The court erred in allowing the State to contradict Jewell Tullis by the testimony of Beatrice Norwood, as stated above. A party

cannot examine a witness as to collateral matters and then impeach him by proof of contradictory statements."

In *McAlister* v. *State,* 99 Ark. 604, 139 S. W. 684, this court said:

" 'Great latitude is allowed in the cross-examination of a witness touching his residence, occupation and habits, so as to reflect light upon his credibility, and specific acts of immorality may be thus elicited which could not be proved by other impeaching witnesses.' But, while it was proper to permit the witness to be asked as to specific acts involving moral turpitude affecting his credibility as a witness, it was error to permit the State to call Dr. Wall for the purpose of contradiction. 'Where a witness is cross-examined as to a particular act of misconduct relevant to his character for truth but disconnected with the cause on trial, the cross examining party is bound by the answer.' 7 Encyclopedia of Evidence, page 180, and cases cited.

" 'In order to avoid an interminable multiplicity of issues, it is a settled rule of practice that when a witness is cross examined on a matter collateral to the issues he cannot, as to his answer, be subsequently contradicted by the party putting the question. The test of whether a fact inquired of on cross-examination is collateral is this: Would the cross-examining party be entitled to prove it as part of his case, tending to establish his plea.' "

The answer, in the present case, to this last question in the citation, is an obvious "No." Numerous other cases hold in the same manner.[10]

While, in *Tullis* and *McAlister,* the questions (which

[10]In *Billings* v. *State,* 52 Ark. 303, 12 S. W. 574, this court discussed the question rather fully, as follows:

"The general rule is well established, in civil as well as in criminal cases, that evidence shall be confined to the issue. It seems that the necessity for the enforcement of the rule is stronger in criminal cases. The facts laid before the jury should consist ex-

brought on the rebuttal testimony) were asked of a witness (rather than a defendant), the same rules of evidence applicable to impeachment of a witness apply where a defendant takes the witness stand in his own behalf. *Castle* v. *State*, 229 Ark. 478, 316 S. W. 2d 701.

We also agree with appellant that the court erred in permitting Margaret Williams, described by Glenda Maroney as her best friend, to testify in rebuttal that Glenda had told the witness early on the morning of her father's death that she recognized Jimmy Ederington as the intruder in her room. The state offered this evidence supposedly as a matter of rebutting the testimony of Captain Gwyn, who had given Glenda a polygraph examination, and had testified that her answer to the question of whether she recognized the intruder had been "No."[11]

Evidence of Miss Williams was inadmissible. In the first place, it was not even proper rebuttal of the testimony of Captain Gwyn. A rebuttal of the testimony of the officer would have been to the effect that Glenda

clusively of the transaction that forms the subject of the indictment, and matters relating thereto. To enlarge the scope of the investigation beyond this would subject the defendant to the dangers of surprise against which no foresight might prepare and no innocence defend. Under this rule it is generally improper to introduce evidence of other offenses; but if facts bear upon the offense charged, they may be proven, although they disclose some other offense. The test of admissibility is the connection of the facts offered, with the subject charged. Such connection exists in a variety of cases, and in them it is often proper to prove one offense in a trial for another. The Supreme Court of Alabama has indicated several classes of cases in which this may be done, as follows: First, when necessary to prove the scienter of guilty knowledge, which is an element of the offense charged; second, when the offense charged and the offense proved are so connected that they form part of one transaction; third, when the act proved and the offense charged are similar, and the one tends to fix the intent in the other; fourth, when it is necessary to prove a motive for the offense charged, and there is an apparent relation or connection between it and the other acts proved; and again when it tends to prove the identity of the offender or of an instrument used."

[11]In her testimony, Glenda stated that she had made a mistake, and that the answer was inadvertently given because she was nervous and upset in taking the test.

did not answer, "No," to his question. However, it was undisputed that this answer was given. At any rate, the evidence was inadmissible, even as an extra-judicial identification. In the case of *Burks* v. *State*, 78 Ark. 271, 93 S. W. 983, Burks was convicted of the crime of assault with intent to kill. The prosecuting witness, W. W. Reiblin, the party upon whom the assault was alleged to have been made, testified that Burks was one of his assailants. He was asked by defendant's counsel if he had not on other occasions stated that he did not recognize the persons who assaulted him. Reiblin denied that this had been done. Witnesses were introduced who testified that Reiblin had made such statements. The court then permitted the state, over the objection of Burks, to offer evidence that Reiblin stated to a witness, a few hours after the assault, that he recognized Burks as one of the assaulting parties. Justice McCulloch, writing for the court, said:

"The question is therefore presented whether or not, where a witness has denied having made a statement contradictory of those made upon the witness stand, and proof is introduced tending to establish such contradictory statements, former statements of the witness consistent with those made by him upon the stand are admissible in support of his testimony."

This court held that the trial court erred in permitting the state to offer this testimony, and reversed the judgment, stating:

"After all, the effect of proof of previous consistent statements could only be to corroborate the statement of the witness under oath by his own words uttered on another occasion. It would add nothing to his statement upon the witness stand, either as to his testimony on the main issue, or as to his denial of the contradiction. We are of the opinion that the admission of the testimony by the court was improper and prejudicial, and should not have been allowed."

We are of the view that the error in both instances, *i. e.,* the testimony of Spraggins relative to statements of the defendant about Ormand, and the admission of the testimony of Margaret Williams, constituted reversible error. This would be particularly true with reference to the Spraggins testimony, which had no connection whatsoever with the offense charged. In *Shaddox* v. *State,* 243 Ark. 55, 418 S. W. 2d 780, quoting from an earlier case, we said:

"In the case under consideration, as in most situations of this nature, we cannot say with certainty that the jurors were prejudiced by the reference to the 'rap sheet,' but we are less sure that they were not. Definitely the manner in which the reference was made was improper, and it left open to the jury a broad field of speculation as to appellant's character and possibly his criminal record."

The rule was stated in *Crosby* v. *State,* 154 Ark. 20, 241 S. W. 380, as follows:

"Where the effect of an erroneous instruction or ruling of the trial court might result in prejudice, the rule is that the judgment must be reversed on account of such ruling, unless it affirmatively appears that there was no prejudice. No such showing is reflected by this record."

Two other matters are urged as points for reversal, one relating to the fact that one of the members of the jury was married to the sister of the sheriff's wife, and the other relating to evidence which the defense contends was suppressed. This last refers to the fact that blood was also found upon the bed in the middle bedroom. Inasmuch as the first error is not likely to occur again, and appellant is now thoroughly acquainted with all of the evidence obtained by the sheriff, there is no need to discuss whether these points have merit.

Because of the two errors committed, and herein

pointed out, the judgment is reversed, and the cause is remanded to the Bradley County Circuit Court.